GIBBONS, J., delivered the opinion of the court, in which BELL, Chief D.J., joined.
ROGERS, J. (pp. 444-456), delivered a separate dissenting opinion.
OPINION
GIBBONS, Circuit Judge.
This appeal represents the third trip to this court for the parties to this litigation. The case has also been before the United States Supreme Court, which made a notable ruling that defendant-appellant Tennessee Secondary School Athletic Association (“TSSAA”) was a state actor.
The parties’ dispute began when the TSSAA imposed a number of penalties on plaintiff-appellee Brentwood Academy (“Brentwood”) as a result of asserted violations by Brentwood of the TSSAA’s rule governing recruiting of student athletes. Brentwood sued the TSSAA and its executive director, defendant-appellant Ronnie Carter, alleging violations of the First and Fourteenth Amendments, federal antitrust laws, and Tennessee law. After the United States Supreme Court determined that the TSSAA is a state actor, this court on remand held that the recruiting rule was content-neutral and subject to intermediate scrutiny. We remanded to the district court with instructions about the proper analysis in the case on the First Amendment issue. The district court conducted a ten-day nonjury trial. The district court found for Brentwood on the First Amendment issue, holding that the application of the rule to Brentwood was not narrowly *416 tailored to further the TSSAA’s legitimate, substantial interests. The district court also found for Brentwood on its substantive and procedural due process claims against the TSSAA, as well as on its procedural due process claim against Carter in his individual capacity. The district court enjoined the TSSAA’s penalties against Brentwood. The district court also held that the TSSAA was entitled to immunity from Brentwood’s antitrust claims. The parties cross-appealed to this court on these issues.
For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings.
I.
A. Factual Overview
We begin with a description of the most pertinent facts and supply additional facts as necessary in our discussion of the various issues.
The TSSAA is a voluntary association of 290 public schools and 55 independent and parochial schools from across the state of Tennessee. The TSSAA is organized as a non-profit corporation under Tennessee law, with the purpose of stimulating and regulating interscholastic athletic competition among its member schools. Its governing entity is the Board of Control. As noted in the Supreme Court’s decision in this case, the Tennessee State Board of Education, beginning in 1925, explicitly acknowledged the TSSAA’s functions “in providing standards, rules and regulations for interscholastic competition in the public schools of Tennessee.” Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 531 U.S. 288, 292, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). In 1972, the Board designated the TSSAA as “the organization to supervise and regulate” interscholastic athletics and specifically approved the TSSAA’s rules and regulations, including the recruiting rule. Id. In 1996, the Board dropped the rule expressly designating the TSSAA as regulator but did not change its relationship with the organization. Id. at 292-93, 121 S.Ct. 924. At all times relevant to the present case, Ronnie Carter served as executive director of the TSSAA.
Brentwood Academy is an independent school in Brentwood, Tennessee, and a member of the TSSAA. In 1998, the school had about 520 students in grades six through twelve. Brentwood’s athletic teams, especially its football team, have been very successful in interscholastic competitions, even though its enrollment is smaller than many of its competitors. At the time of the events in question, Brent-wood’s Headmaster was Bill Brown; the Athletic Director and Head Football Coach was Carlton Flatt; and the Director of Admissions was Nancy Brasher. Brent-wood paid a fee to the TSSAA to renew its membership on an annual basis.
The TSSAA has promulgated a “recruiting rule” in order to regulate the attempts of secondary schools to recruit middle school student athletes for athletic programs. The rule, found in the TSSAA’s Bylaws, reads:
The use of undue influence on a student (with or without an athletic record), his or her parents or guardians of a student by any person connected, or not connected, with the school to secure or to retain a student for athletic purposes shall be a violation of the recruiting rule.
The bylaws also include a number of questions and answers and other guidelines that are known as interpretive commentary. While these are meant to aid in the interpretation of the recruiting rule, they are not binding on the TSSAA Board of Control. Carter agreed that the recruiting rule itself is “all that really counts, *417 everything else underneath it, the interpretative commentary is discretionary and it depends on the totality of the circumstances.”
Excerpts from the interpretive commentary include the following:
1.
Q. How is undue influence interpreted in the recruiting rule?
A. A person or persons exceeding what is appropriate or normal and offering an incentive or inducement to a student with or without an athletic record.
3.
Q. Is it permissible for a coach to contact a student or his or her parents prior to his enrollment in the school?
A. No, a coach may not contact a student or his or her parents prior to his enrollment in the school. This shall apply to all students whether or not they have an athletic record.
4.
Q. What are some of the guides [sic] used in determining whether there has been undue influence used which would result in a violation of the recruiting rule?
A. Some examples are, but not limited to:
3. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete enrolled in any member school except where there is a definite feeder pattern.
4. Any initial contact or prearranged contact by a member of the coaching staff or representative of the school and a prospective student/athlete in the seventh grade and above at any non-member school except where there is a definite feeder pattern involving the schools.
Private... schools may not contact students enrolled at the public schools. Public schools may not contact students enrolled at the private schools.
7. Admitting students to athletic contests free of charge when there is an admission being charged at the contest except where there is a definite feeder pattern involved with the school.
The “definite feeder pattern” exception does not apply to Brentwood, except with regard to those students who are enrolled at Brentwood Academy itself in the sixth grade or higher.
In some form, the recruiting rule has been in effect at least since the early 1950s and probably earlier. It has undergone various changes; the auxiliary questions and answers and guidelines were added during the 1980s and 90s.
In 1997, a number of coaches at public high schools that were TSSAA members reported various alleged recruiting violations by Brentwood to the TSSAA. On behalf of the TSSAA, Carter and other TSSAA officials began an investigation into the allegations. During the investigation, Brentwood supplied Carter with a copy of a letter Flatt sent to various eighth grade boys in April 1997 as well as information regarding phone calls Flatt made to the families of the boys to whom the letter was sent. The letter read, in part:
Having officially enrolled at Brentwood Academy, the TSSAA allows you to participate in spring football practice. If you are not currently involved in a sport *418 at your school, we would like to invite you to practice with your new team.... Due to the inconvenience to your parents, please do not feel that you must attend every practice. However, I do feel that getting involved as soon as possible would definitely be to your advantage .... We are certainly glad that you decided to become an Eagle.
The letter was signed, ‘Tour Coach, Carlton Flatt.” This letter was sent to all incoming ninth grade male students who had applied, been tested and admitted, and signed enrollment contracts with Brent-wood.[1] Flatt testified that after the letter was mailed, he received “a couple of phone calls” from parents of boys who received the letter with questions about the letter and the necessity of the boys attending practice. As a result of these calls, Flatt decided to call each of the families of the boys who received the letter to clarify that the spring practice was not mandatory and should not trump any other academic or athletic responsibility the boys might have. All twelve boys who received the letter ended up attending spring practice.
The TSSAA also investigated allegations that tickets for a Brentwood football game provided by Flatt to a middle school coach were used by some of the coach’s student athletes to attend the game for free. As the TSSAA put it, these tickets were “made available to uncontrolled individuals” in a way that facilitated “the possibility for abuse.” Flatt later testified that he had told the coach that the tickets were not to be used to provide free admission to middle school students. The middle school coach nonetheless allowed two of the free tickets to be used by two of his students.
Carter notified Brentwood by letter dated July 29, 1997, that the TSSAA had found Brentwood guilty of multiple violations of TSSAA rules. The letter informed Brentwood of various penalties that would be assessed as a result of the rules violations. Brentwood requested a hearing with Carter and members of the TSSAA Board of Control; a hearing was held on August 13, 1997, at which Headmaster Brown and representatives of Brentwood made a presentation regarding the allegations and determinations in the July 29 letter. Following the hearing, Carter again sent a letter to Brown providing more specific information about the violations and penalties to be assessed against Brentwood. Pursuant to the TSSAA Bylaws, Brentwood appealed the penalties to the full Board of Control, which is charged with enforcing the TSSAA Bylaws. Another hearing was held on August 23,1997. In an August 23, 1997, letter that represented the final TSSAA decision on the matter, the Board notified Brentwood that it had found that Brentwood, and specifically Flatt, violated the recruiting rule in two ways: (1) by granting free admission to a Brentwood football game to two *419 eighth grade athletes from another school; and (2) by sending letters and making phone calls to eighth grade boys at other schools regarding spring football practice at Brentwood.[2] The Board also cited Brentwood for conducting impermissible off-season practice with certain Brentwood student-athletes, but this alleged rule violation is not an issue in this appeal. As a result of these violations, the Board imposed numerous penalties, including a four-year probation for Brentwood’s entire athletic program, suspension of playoff eligibility for the Brentwood football and boys’ basketball teams, and a $3,000 fíne.
B. Procedural History
Brentwood sued the TSSAA and Carter (in his official and individual capacities) on December 12, 1997, alleging that the TSSAA violated the First and Fourteenth Amendments; the Sherman Act, 15 U.S.C. §§ 1-2; and Tennessee law. On July 29, 1998, the district court found that the TSSAA and Carter were state actors and granted summary judgment to Brentwood on its First Amendment claim brought under 42 U.S.C. § 1983. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 13 F.Supp.2d 670 (M.D.Tenn.1998). The TSSAA appealed that decision, and the Sixth Circuit reversed, on the basis that the TSSAA is not a state actor and thus not subject to suit under § 1983. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 180 F.3d 758 (6th Cir.1999). The United States Supreme Court granted certiorari and reversed the Sixth Circuit, holding that “the association’s regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association.” Brentwood Acad., 531 U.S. at 291, 121 S.Ct. 924.
On remand from the Supreme Court, this court considered the merits of the TSSAA’s appeal. This court reversed the decision of the district court granting summary judgment to Brentwood and remanded the case to the district court, holding that: (1) Brentwood did not waive its right to challenge the recruiting rule by voluntarily joining the TSSAA; (2) the recruiting rule is not facially overbroad; and (3) the district court erred by subjecting the recruiting rule to strict scrutiny, because it is content-neutral. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 262 F.3d 543 (6th Cir.2001). This court remanded to the district court with instructions to: (1) determine whether the TSSAA’s asserted substantial state interests for the recruiting rule were legitimate; (2) determine whether the application of the rule to Brentwood was narrowly tailored to further the TSSAA’s legitimate state interests; and (3) address Brent-wood’s claims against Carter in his official and individual capacities. Id. at 558.
After remand and prior to trial, on October 25, 2002, the district court granted partial summary judgment to defendants on Brentwood’s antitrust claims, reasoning that since TSSAA is an organization “pervasively entwined” with the state, it is entitled to antitrust immunity under Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).
In December 2002, the district court held a bench trial and considered the issues addressed by this court in its 2001 opinion, as well as Brentwood’s substantive due process, procedural due process, equal protection, and Tennessee state law claims. *420 The court issued a memorandum opinion and order on January 13, 2003, finding: (1) for Brentwood on its First Amendment, substantive due process, and procedural due process claims against the TSSAA; (2) for Brentwood on its procedural due process claim against Carter in his individual capacity; and (3) for Carter with regard to Brentwood’s First Amendment and substantive due process claims against Carter in his individual capacity. See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass’n, 304 F.Supp.2d 981 (M.D.Tenn.2003). The court held that Carter was not entitled to qualified immunity on Brentwood’s procedural due process claim but that he would be entitled to qualified immunity on Brentwood’s First Amendment claim. The court declined to reach the equal protection or state law claims, and it refused to award damages to Brentwood. As relief for Brentwood, the court enjoined the penalties imposed by the TSSAA against Brentwood in 1997.
On February 10, 2003, the TSSAA and Carter appealed the January 13, 2003, order to this court. On February 24, 2003, Brentwood cross-appealed, talcing issue with: (1) the district court’s October 2002 order granting partial summary judgment to defendants on the antitrust claims; and (2) the relief provisions of the January 13, 2003, order.[3]
II. Analysis of the Issues
This court reviews a district court’s findings of fact for clear error. See Waxman v. Luna, 881 F.2d 237, 240 (6th Cir.1989). However, conclusions of law, questions of mixed law and fact, and “findings of ultimate facts which result from the application of legal principles to subsidiary factual determinations” are all subject to de novo review. Id. (citation and quotation marks omitted); see Cordrey v. Euckert, 917 F.2d 1460, 1465 (6th Cir.1990).
A. The TSSAA’s Reliance on Its Contractual Relationship with Its Members
Permeating the TSSAA’s arguments [4] on both the First Amendment and due process issues is its contention that rulings by the district court “ignored the constitutionally critical fact that the relationship between TSSAA and [Brentwood] arose entirely from a membership contract that [Brentwood] renewed each year.” In other words, according to the TSSAA, “[e]very argument of [Brentwood] and every ruling by the District Court relies [sic] on the false premise that TSSAA is the sovereign State exercising police power rather than a state actor that asks its members to honor its voluntary contractual obligations.” Prior to undertaking analysis of the First Amendment claim, we must address this argument as it relates to that claim.
There is a short answer to the TSSAA’s argument with regard to the First Amendment claim. The answer is that it is inconsistent with the law of the case and this court’s 2001 opinion. In the 2001 opinion this court outlined the First Amendment analysis to be employed by the district court on remand. See Brentwood Acad., 262 F.3d at 557-58. The underpinning of that analysis is that the *421 TSSAA’s role in this case is that of a governmental entity exercising regulatory authority and that the recruiting rule must be considered a content-neutral rule subject to intermediate scrutiny. The court noted with particularity that the recruiting rule was analogous to zoning ordinances and limitations on noise, posting of signs, and distribution of religious literature that have been upheld as reasonable time, place, and manner restrictions. Id. at 553-54. The panel in the 2001 decision instructed the district court on remand to determine whether the recruiting rule is narrowly tailored to meet TSSAA’s substantial interests. Id. at 558. It noted that this question could not be decided in the abstract as a matter of law and contemplated that TSSAA would present evidence to justify the need for its regulations. Id. The panel was quite clear in outlining the district court’s task on remand.
The TSSAA’s reasoning invites us to stray from the 2001 panel’s road map and follow another analytical route it deems more favorable to its position. In making its argument, it suggests that two lines of First Amendment cases — unconstitutional conditions cases represented by cases such as Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), and government employee speech cases such as Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) — provide the correct analytical framework. Both lines of cases were mentioned by the panel in its 2001 opinion but in a context different from that in which the TSSAA now urges that they apply.
One argument made by the TSSAA in 2001, bearing substantial resemblance to its present position, was that Brentwood “waived its right to question the constitutionality of the recruiting rule because, by voluntarily choosing to be a member of TSSAA, it has agreed to abide by the rules of the organization.” Brentwood Acad., 262 F.3d at 549. This court rejected that argument, reasoning that “the Supreme Court’s rulings that parties do not give up First Amendment rights by contracting with, or being employed by, a public agency forecloses [sic] TSSAA’s argument that Brentwood gave up its right to challenge the constitutionality of the recruiting rule because it voluntarily joined TSSAA.” Id. at 550-51 (citing Umbehr and Pickering). While Umbehr and Pickering may have given guidance in disposing of the waiver argument, the 2001 opinion in no way indicates that they govern the analysis on remand as to whether the TSSAA’s application of the recruiting rule to Brentwood violated its First Amendment rights.
Our agreement or disagreement with the 2001 panel decision is not at issue here. We have no authority to overturn a prior published decision of this court, see Darrah v. City of Oak Park, 255 F.3d 301, 309 (6th Cir.2001), and, moreover, that decision is the law of the case, see Scott v. Churchill, 377 F.3d 565, 569-70 (6th Cir.2004). While courts have some discretion in following the law of the case doctrine, see id. at 570, this protracted and contentious litigation presents a compelling situation for its application. In order to maintain the integrity of the judicial process, an appellate court cannot change its mind as to the proper analysis after it has remanded a case for trial and the district court has tried it, giving its best effort to adhere faithfully to the appellate court instructions. We should properly review the district court’s decision, but we cannot change the rules after the fact. See United States v. Campbell, 168 F.3d 263, 265 (6th Cir.1999) (“Determinations of the court of appeals of issues of law are binding on both the district court on remand and the court *422 of appeals upon subsequent appeal.”). This stance properly defers to the precedent set by the prior panel and recognizes that the parties and the district court must be able to rely on this court’s prior rulings in trying the case.[5]
While this court’s 2001 ruling provides the definitive answer to the First Amendment argument based on the TSSAA’s contractual relationship with its members, we note also that clear problems exist with the manner in which the TSSAA seeks to apply the “unconstitutional conditions” doctrine. The TSSAA relies on Umbehr to argue that the “unconstitutional conditions doctrine specifically allows a state agency to impose conditions, even on fundamental rights like free speech, when those conditions are reasonably necessary to accomplish the objectives of the contract.” This is not an accurate reading of Umbehr, which held that the First Amendment limits the government’s ability to terminate relationships with independent contractors because of their speech. See 518 U.S. at 673-74, 116 S.Ct. 2342. Moreover, Umbehr, in which the Court addressed only the narrow issue of “whether, and to what extent, independent contractors [with the government] are protected by the First Amendment,” id. at 673, 116 S.Ct. 2342, is not a precisely apposite precedent anyway. See also id. at 685, 116 S.Ct. 2342 (emphasizing the “limited nature of our decision today”). The present case does not involve the government as a party in a contractual relationship with an independent contractor, cf. id. at 678-79, 116 S.Ct. 2342.
Similarly, there are obvious differences between the TSSAA’s role in this case and the government’s role as employer, cf. Pickering, 391 U.S. at 574, 88 S.Ct. 1731. The TSSAA’s reliance on the argument that Brentwood’s speech is not a matter of public concern is thus misplaced. The requirement that speech relate to a matter of public concern in order to be protected emanates from the government employee cases in which employee speech is limited in many respects by virtue of the employer-employee relationship. See id. at 568, 88 S.Ct. 1731 (“The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.”). The public concern requirement is not a part of the intermediate scrutiny given to a content-neutral restriction on speech. The 2001 decision of this court, in discussing the waiver issue, described the way in which public interests were to be taken into account on remand. In that decision, this court observed that substantial government interests, which the TSSAA would have to establish, were of necessity matters of public concern. Brentwood Acad., 262 F.3d at 551. In making this observation, it placed the public interests concept in its proper place in the framework adopted later in the opinion — on the governmental interest in promulgating the rule, not on the question of whether Brentwood’s speech related to a matter of public concern. See id. at 557-58.
*423 A couple of nuances in the TSSAA’s argument deserve mention. The TSSAA urges the applicability of its preferred analysis by differentiating between the government’s “sovereign power” and its “contractual power.” In doing so, it makes much of the dicta in Umbehr discussing the difference between the government’s “sovereign power” and its “contractual power.” See 518 U.S. at 678, 116 S.Ct. 2342. Reading Umbehr too broadly, it asserts that Umbehr extended the Pickering “public concern” framework to “any case where the government is exercising contractual power as opposed to sovereign power.” Again, the applicability of the First Amendment to the TSSAA’s regulatory conduct does not hinge on whether there was a contract or not. Even if such a distinction between contractual and sovereign power were applicable in any meaningful way to the present case, the Court’s conclusion in Umbehr — that some scrutiny more deferential than strict scrutiny should apply when the government exercises contractual power — does not suggest that the First Amendment does not apply to the TSSAA’s enforcement of its recruiting rule. See id. In fact, Umbehr suggests that the approach this court took in its previous opinion was the right one: that the First Amendment does apply to the rule, and intermediate scrutiny is the standard to which the rule should be subjected. See Brentwood Acad., 262 F.3d at 551-54; see also Umbehr, 518 U.S. at 678, 116 S.Ct. 2342 (“The tests that we have established in our government employment cases must be judicially administered with sensitivity to governmental needs, but First Amendment rights must not be neglected.”).
A second nuance relates to the TSSAA’s efforts to cast the present case as a “subsidy” case, where the government has considerable autonomy over how a government program is administered. This characterization is similarly futile. The defendants state in their brief that “TSSAA membership is a subsidy” and that under Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), the government acting as a contractor in a subsidy context “must be able to require the contracting party to limit its speech when reasonably necessary to effectuate the purposes of the contract.” Tellingly, the defendants cite to no page in the Rust opinion that supports this reading of the case; there is none. Rust involved a government funding program involving disbursements to doctors to advise patients on family planning topics. One condition of the program was that no funds could be used in programs where abortion was presented as a method of family planning. The Court upheld the program, reasoning that Congress had “merely chosen to fund one activity to the exclusion of the other.” Id. at 193, 111 S.Ct. 1759. In later First Amendment jurisprudence, the Court “explained Rust on th[e] understanding” that the government in that case was itself engaging in speech and could thus make viewpoint-based funding decisions. See Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001); see also United States v. Am. Library Ass’n, 539 U.S. 194, 211-12, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) (plurality opinion) (citing Rust in upholding the government’s requirement that libraries receiving federal subsidies utilize filtering software). Clearly, the TSSAA’s enforcement of the recruiting rule is not a funding program. Nor does it represent government speech. Cases like Rust do not govern the present case.
Thus, as the 2001 panel determined, the appropriate characterization of the TSSAA’s role is as a government regulator, a context to which the First Amendment surely applies. See, e.g., Rosenber- *424 ger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 834-35, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); Forsyth County v. Nationalist Movement, 505 U.S. 123, 130-31, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992); see also Brentwood Acad., 531 U.S. at 291, 121 S.Ct. 924 (holding that the association’s “regulatory activity” is state action, even though “[n]o school is forced to join” the TSSAA) (emphasis added); id. at 292-93, 121 S.Ct. 924 (noting that the Tennessee State Board of Education designated the TSSAA as “the organization to supervise and regulate [interscholastic] athletic activities” in Tennessee, and that the present case was triggered by a “regulatory enforcement proceeding”) (emphasis added). The applicability of the First Amendment to regulation of speech by the government in this context does not vary depending on whether the speech relates to a matter of public concern or whether the relationship between the government and the speaker is voluntary or contractual. For example, when the government regulates how and when citizens can enter into voluntary contractual relationships with the government that regulate certain speech by those citizens, the government’s licensing or regulatory scheme must meet constitutional standards, regardless of whether the speech at issue involves a matter of public concern. See Forsyth County, 505 U.S. at 129-31, 112 S.Ct. 2395; Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 552-53, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). The same goes for the TSSAA’s application of its recruiting rule.
We thus reject the defendants’ attempt to reshape the framework through which we view this case — a framework set out by this court previously and utilized by the district court in trying the case. The TSSAA, in administering its rules and regulations and imposing penalties against member schools, acts as a regulator, not as an employer, contractor, or disburser of funds. Therefore, as this court has previously concluded, Brentwood’s First Amendment rights are at issue in this case, and intermediate scrutiny applies to the TSSAA’s application and enforcement of the recruiting rule.
The dissenting opinion accepts the TSSAA’s invitation to revisit previously rejected arguments and to recharacterize them as new ones. In fact, it even goes beyond the TSSAA’s arguments and suggests that no First Amendment rights are implicated here.
The opening sentences of the dissenting opinion are conceptually attractive when first read. They are: “High school football is a game. Games have rules.” Of course, games have rules. And so do cases. Here, the rule is called “law of the case.” The dissent correctly notes that this dispute hardly evokes our notions of the core values of the First Amendment; the same could doubtless be said of other examples of First Amendment jurisprudence. But, in this case, the time for appellate court observation of any lack of a First Amendment issue was long ago.
In recycling the TSSAA’s waiver argument, the dissent characterizes the 2001 panel decision as dealing with a broad issue of whether Brentwood had waived its right to sue entirely. The problem with this interpretation is that in 2001 Brent-wood had sued and had challenged the same rule at issue in this appeal. The panel was discussing waiver in this context, and the clear import of its decision is that Brentwood had not waived or given up its right to challenge the rule at issue here by entering into a contract with the TSSAA.
Another difficulty with the dissent’s waiver theory is that it is implicitly based on the content of the contract. Yet the *425 contract here contains no provision that assists in the analysis. Brentwood does agree to be bound by the rules. If the TSSAA were not a state actor, that would be the end of the story. Since the TSSAA is a state actor, the contract gives no guidance as to whether Brentwood waived a right to challenge a rule it considered unconstitutional. The contract’s silence thus becomes evidence of an absence of waiver of constitutional rights. The silence provides no basis for differentiating between a waiver of some rights and not others.
B. Application of the Recruiting Rule to Brentwood
Turning to the analysis of the First Amendment issue, we consider whether the TSSAA’s application of the recruiting rule to Brentwood violates the First Amendment. In the 2001 opinion, the court laid out the intermediate scrutiny analysis that applies to content-neutral regulations:
[A] regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government’s legitimate, content-neutral interests but ... it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation .... The validity of time, place, or manner regulations does not turn on a judge’s agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.
Brentwood Acad., 262 F.3d at 557 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 798-800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (internal quotations, citations, footnotes, and alterations omitted)). The TSSAA has asserted three interests as justification for the recruiting rule: (1) to keep high school athletics in their proper place subordinate to academics; (2) to protect student athletes from exploitation; and (3) to foster a level playing field among the various member schools. See id. In its previous opinion, this court recognized the first interest as legitimate and substantial. See id. at 557-58 (citing Crocker v. Tenn. Secondary Sch. Athletic Ass’n, 980 F.2d 382, 386-87 (6th Cir.1992)). This court remanded to the district court to determine whether the TSSAA’s other two asserted substantial state interests for the recruiting rule were legitimate. Id. at 558.
The district court held that the TSSAA has a substantial governmental interest in protecting student athletes from exploitation. While it also held that the TSSAA’s interest in fostering a “level playing field” was a legitimate governmental interest, it found that this interest was not substantial, especially considering that “[t]he substantial governmental interest in informed school choice trumps any governmental interest in controlling which schools or teams win athletic contests.” Unlike rational basis review, intermediate scrutiny does not allow a court to supplant the particular interests put forward by the state with other suppositions. See Edenfield v. Fane, 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). In determining whether an interest is substantial, a court must look beyond “hypothesized justifications,” Thompson v. W. States Med. Ctr., 535 U.S. 357, 373-74, 122 S.Ct. 1497, 152 L.Ed.2d 563 (2002), and focus instead on the “actual interests served by the restriction.” Edenfield, 507 U.S. at *426 768, 113 S.Ct. 1792.[6]
The district court’s conclusions regarding the TSSAA’s interests, which we review de novo, were not erroneous. With regard to the asserted interest of protecting student athletes against exploitation, the TSSAA presented voluminous evidence at trial, primarily via expert witness testimony, in support of its argument that this interest is a substantial one. Carter testified that the “fundamental” reason for the recruiting rule was preventing exploitation. One of Brentwood’s expert witnesses even testified that preventing the exploitation of student athletes, defined as the “selfish, unjust utilization of students for a school’s benefit rather than for the benefit of the individual student,” was a compelling state interest. At one point in its brief, Brentwood seems to suggest that evidence such as written legislative history or testimony from the initial drafters of the recruiting rule is necessary to prove that preventing exploitation of students was one of TSSAA’s “actual” interests in applying the rule to Brentwood.[7] For the purposes of the first prong of the intermediate scrutiny test, it is only necessary to establish that the actual interest exists and is substantial, and this can be done without resort to such primary sources. While there is no known written legislative history for the recruiting rule and all of the initial drafters of the rule are dead, the evidence, especially Carter’s testimony under oath, suggests that preventing the exploitation of middle school student athletes is a substantial state interest and was one of the TSSAA’s “actual” interests in applying the rule to Brentwood. See City of Erie v. Pap’s A.M., 529 U.S. 277, 312, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (Souter, J., concurring in part and dissenting in part) (quoting Turner Broad. Sys. v. FCC, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (plurality opinion)) (noting that the state can regulate speech to further an interest in preventing reasonably “anticipated harm,” as long as the harm is real); see also Knight Foundation Commission on Intercollegiate Athletics, A Call to Action: Reconnecting College Sports and Higher Education 20-21 (2001) (noting that “[h]igh school sports today can reflect the worst of their collegiate counterparts” in terms of exploitative commercial influences, pervasive recruiting efforts, and academic compromises for student athletes focused only on a professional athletic career); cf. Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 462, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (holding that the state has an important interest in preventing solicitation by lawyers that involves undue influence, intimidation, overreaching, and other forms of “vexatious conduct”).
The TSSAA also introduced evidence that supports its contention that fostering a level playing field among member *427 schools is a legitimate state interest. Specifically, its experts and Brentwood’s own Headmaster Brown testified that the recruiting prohibition helps level the playing field among schools, especially as between private schools with significant resources and public schools with more limited resources and access to potential students. Carter testified at length about how the recruiting rule preserves competitive equity among schools, explaining that without the rule, “the rich would get rich real quick, and the poor would get poor real quick.” There is very little, if any, evidence, however, explaining ivhy competitive equity is an important value in the first place. It may be true, as defendants claim in their brief, that “maintenance of fair competition among [the TSSAA’s] members lies at the core of [the TSSAA’s] reason for being,” but simply saying this is so does nothing to demonstrate why such a “reason for being” is a substantial state interest. State actors may act out of a variety of interests, but only some are substantial. The defendants can cite to no evidence to support the notion that ensuring that high schools compete in interscholastic sports in an equitable manner is a substantial state interest, especially when coupled with the admittedly substantial interest of ensuring that athletics do not become more important than academics at the high school level. The district court was right that this interest, while legitimate, is not-substantial.[8]
Having established that the TSSAA has substantial state interests in keeping athletics subordinate to academics and preventing the exploitation of student athletes, the next question in the analysis, as set out in this court’s previous opinion on the matter, is whether the recruiting rule, “as applied to Brentwood,” is narrowly tailored to further those interests. See Brentwood Acad., 262 F.3d at 557; see also Turner Broad. Sys., 512 U.S. at 664, 114 S.Ct. 2445 (plurality opinion) (“That the Government’s asserted interests are important in the abstract does not mean... that the [speech regulation] will in fact advance those interests.”). Specifically, the district court’s task was
to decide if the punishment exacted for these alleged violations relating to the free game tickets, spring football-practice letters, and the followup telephone calls was appropriate regulatory action narrowly tailored to further TSSAA’s legitimate interests as a state actor .... In proceeding with this case on remand, we caution both the parties and the district court to stay focused on the two alleged recruiting rule violations in question, rather than engage in a wide-ranging attack or defense of the recruiting rule as a whole.[9]
*428 Brentwood Acad., 262 F.3d at 558. This court also noted in its previous opinion that the application of the recruiting rule must not “ ‘unreasonably limit alternative avenues of communication.’ ” Id. at 554 (quoting City of Renton v. Playtime The-atres, Inc., 475 U.S. 41, 47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). On remand, the district court held that the recruiting rule “is not narrowly tailored to further any of the three governmental interests of the TSSAA as applied to Brentwood Academy.” [10]
Reviewing de novo, we affirm this conclusion. The defendants import a definition of “enrolled” from a separate provision in the TSSAA Bylaws to support their argument that the students contacted by the letters and calls were not truly enrolled at Brentwood and that Brentwood therefore violated the recruiting rule by contacting them. Putting aside the fact that the Bylaw provision upon which defendants rely seems to apply not to practices or recruiting but rather only to eligibility to participate in athletic contests, the defendants’ contention that the students at issue were not enrolled misses the point. Considering that the interpretive commentary to the recruiting rule is not binding and serves only as a guideline, the TSSAA’s use of its discretion to punish Brentwood for the letters and calls was not a narrowly tailored way to keep athletics subordinate to academics at Brentwood or ensure that the student athletes being contacted were not being exploited.[11]
First, surely, however one defines “exploitation,” this interest was not furthered by punishing Brentwood. As the district court pointed out, the students contacted by the letter and calls had already signed enrollment contracts with Brentwood Academy, and the letter and calls were directed to all male students who had done so. In fact, Brentwood did not send the letter to one male student who had been accepted by Brentwood but had not yet signed an enrollment contract. Indeed, the students contacted had all agreed, and by all accounts were excited, to attend Brentwood the following year. Additionally, it is clear that the followup phone calls were made to clarify for the students involved that the practice was optional and should not preclude any other commitments they might have. The district court was right that “[n]either students nor parents were exploited in theory or in fact.”
With regard to the former interest (keeping athletics subordinate to academics), it is a closer call, but the TSSAA’s use of the regulation to punish Brentwood seems to “burden substantially more *429 speech than is necessary to farther the government’s legitimate interest[ ]” in keeping athletics subordinate to academics. See Ward, 491 U.S. at 799, 109 S.Ct. 2746; see also United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (holding that content-neutral regulations will be sustained only “if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest”). The TSSAA must demonstrate that in this situation “the recited harms [were] real, not merely conjectual, and that the regulation [would have] in fact alleviate[d] these harms in a direct and material way.” Turner Broad. Sys., 512 U.S. at 664, 114 S.Ct. 2445. They did not demonstrate this at trial. The district court obviously found the testimony of the parents of the boys in question to be more significant and persuasive than evidence from experts indicating that the letters and calls might — in theory — signal an emphasis on athletics over academics. The parents indicated they were glad to get the letter, and they did not at all think the implication of the letter was that Brent-wood subordinated athletics to academics.
If the letters and calls were the first or only pieces of information the students or their families had ever received about Brentwood or would receive before arriving at the school, then an argument could be made that the school was unduly emphasizing athletics over academics. This was not the case. Each of the families of the children in question had already signed enrollment contracts with Brentwood. The information about spring football practice was simply information being provided to incoming students about an extracurricular activity available to them — an activity in which incoming students were allowed to participate under TSSAA rules.[12] Incoming students at Brentwood received a variety of information about a multitude of topics and activities, including academics at the school, and the letters and calls should be seen in this context.[13]
*430 Even if the students could (and sometimes did) “wiggle out” of their contracts with Brentwood, this did not mean that Brentwood should be punished for disseminating information about an optional activity for incoming Brentwood students. In fact, defendants’ argument that the students in question were not technically enrolled and could have still decided to attend another school might even weigh in Brentwood’s favor, in that the letters and calls could be seen as part of an ongoing attempt to make sure the incoming students were informed about what Brent-wood had to offer. That these particular communications emphasized athletics does not mean that punishing Brentwood for the communications served the TSSAA’s interest in keeping athletics subordinate to academics. In this context, the harm the TSSAA sought to prevent was “conjectual,” not “real,” or at least not based on the evidence in the record. See id. Put another way, it is not clear that the TSSAA’s substantial interest in subordinating athletics to academics was achieved any more effectively by punishing Brentwood for Flatt’s letters and calls than it would have been had no punishment been handed down. Cf. Ward, 491 U.S. at 798-801, 800, 109 S.Ct. 2746 n. 7 (holding that a sound-amplification guideline that eliminated the evils the city sought to eradicate without restricting a substantial quantity of speech represented “the essence of narrow tailoring,” because it was not “substantially broader than necessary to achieve the interests justifying it”); Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 810, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (upholding a time/place/manner regulation because it “responded] precisely to the substantive problem which legitimately concerns the City”).
To justify its regulation on Brentwood’s speech, the TSSAA cannot rely on “shoddy data or reasoning”; rather, its evidence must “fairly support [its] rationale” for the application of the recruiting rule to the letters and calls. See City of L.A. v. Alameda Books, Inc., 535 U.S. 425, 438, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002). Carter himself seemed to doubt that one could actually measure whether such letters and calls would emphasize athletics over academics or exploit the children:
Well, I think, first of all, you can’t measure — you can’t measure it on the effect that it had on those kids or any other circumstance that would occur. If [exploitation] occurs, then it’s very difficult to imagine what impact it has on or to figure out what impact — I very seldom have seen kids in those situations that think it’s had any impact on them. But it’s very hard to turn around and determine that.
Carter’s instinct was accurate, since despite evidence by numerous parents, school officials, and experts at trial, there was no evidence to show that the punishment of Brentwood was justified due to the effect of Brentwood’s actions on the children or the relative standing of academics and athletics at the school. In sum, the TSSAA did not show that the application of the recruiting rule to Brentwood was narrowly tailored to serve the TSSAA’s substantial interests.[14] Reviewing de *431 novo, we affirm the holding by the district court on this issue.[15]
C. Free Tickets as a Substantive Due Process Violation
The district court also held that the application of the recruiting rule to Brentwood violated the school’s substantive due process rights with regard to the free tickets used by two students to attend a Brentwood football game. After citing authority indicating that the doctrine of substantive due process means that “governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed,” see Pearson v. City of Grand Blanc, 961 F.2d 1211, 1216 (6th Cir.1992) (internal quotation marks and citation omitted), the district court centered its *432 substantive due process analysis on the notion that
[a]s applied, the Recruiting Rule did not give Brentwood Academy constitutionally adequate notice that providing tickets to another coach, who secretly disregards express instructions to use the tickets only for adults, will constitute a violation. The Recruiting Rule is unconstitutionally vague as applied to Brent-wood Academy on the facts of this case.
The court went on to explain that “the Recruiting Rule did not give... Brentwood Academy[] a reasonable opportunity to know what was prohibited with regard to complimentary tickets so that it could act accordingly.”
When the vagueness argument was formulated as a First Amendment challenge, this court repudiated it. See Brentwood Acad., 262 F.3d at 557 (“As a whole, the [recruiting] rule gives reasonable notice of what is prohibited, especially as applied to Brentwood.”). Essentially, the district court has now recast its previous holding striking down the recruiting rule as over-broad and vague (a holding that was reversed) as a determination that Brent-wood’s substantive due process rights were violated. See Brentwood Acad., 13 F.Supp.2d at 693. Yet, if the substantive due process claim is characterized as a vagueness challenge,[16] then for the reasons set out in this court’s previous opinion, the claim fails. See Brentwood Acad., 262 F.3d at 555-57; see also Grayned v. City of Rockford, 408 U.S. 104, 112, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (upholding an anti-noise ordinance against a vagueness challenge because it clearly “delineates its reach in words of common understanding”) (internal quotation marks and citation omitted). If the substantive due process claim instead rests on an argument that the TSSAA’s application of the recruiting rule infringed some fundamental constitutional right, the claim fails because no such right is implicated here,[17] and the TSSAA’s action was thus subject only to rational basis scrutiny. See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 488, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Lastly, if the substantive due process claim rests, as the district court seems to intimate at one point, on an allegation that the TSSAA acted arbitrarily or capriciously to deprive Brentwood of a property or liberty interest, it still fails, at least as a substantive due process claim. Brentwood could not reasonably allege that the defendants perpetrated an “egregious abuse of governmental power” sufficient to give rise to a substantive due process claim, because there is no evidence to suggest that the defendants “maliciously and intentionally abused [their] state authority in order to injure” Brentwood. See Vinson v. Campbell County Fiscal Court, 820 F.2d 194, 201 (6th Cir.1987). Indeed, such a claim of *433 a deprivation of a property or liberty interest, at least outside of the zoning context, see Pearson, 961 F.2d at 1217, is more appropriately characterized as a procedural due process claim, which is considered infra. For all of these reasons, the district court erred in concluding that the application of the recruiting rule to penalize Brentwood for the free game tickets episode violated Brentwood’s substantive due process rights. We reverse the district court on this issue.
D. Procedural Due Process Claim
The district court also found that Brentwood’s procedural due process rights were violated. The Fourteenth Amendment provides, in part, that “[n]o State shall ... deprive any person of life, liberty, or property, without due process of law.” U.S. Const. amend. XIV, § 1. Procedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest. See, e.g., Thompson v. Ashe, 250 F.3d 399, 407 (6th Cir.2001) (“Courts have long recognized that the Fourteenth Amendment requires that an individual who is deprived of an interest in liberty or property be given notice and a hearing.”). Only after a plaintiff has met the burden of demonstrating that he possessed a protected property or liberty interest and was deprived of that interest will the court consider whether the process provided the plaintiff in conjunction with the deprivation, or lack thereof, violated his rights to due process. Hamilton v. Myers, 281 F.3d 520, 529 (6th Cir.2002).
The first issue is whether Brent-wood was deprived of a property interest. Clearly, at a minimum, fining Brentwood $3,000 deprived Brentwood of a property interest. See Herrada v. City of Detroit, 275 F.3d 553, 556 (6th Cir.2001). The panel need not decide whether potential lost revenues due to the ban from playoff participation also qualify as a property interest.
The second step in the procedural due process analysis is determining whether the TSSAA’s deprivation of Brentwood’s property interest contravened notions of due process. Under circuit precedent, a § 1983 plaintiff can prevail on a procedural due process claim by demonstrating that the property deprivation resulted from either: (1) an “established state procedure that itself violates due process rights,” or (2) a “random and unauthorized act” causing a loss for which available state remedies would not adequately compensate the plaintiff. Macene v. MJW, Inc., 951 F.2d 700, 706 (6th Cir.1991). A plaintiff alleging the first element of this test would not need to demonstrate the inadequacy of state remedies. Moore v. Bd. of Educ. of Johnson City Sch., 134 F.3d 781, 785 (6th Cir.1998). If the plaintiff pursues the second line of argument, he must navigate the rule of Parratt v. Taylor, 451 U.S. 527, 539, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), which holds that a state may satisfy procedural due process with only an adequate postdeprivation procedure when the state action was “random and unauthorized.” See Macene, 951 F.2d at 706. In Zinermon v. Burch, 494 U.S. 113, 128-29, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court narrowed the Parratt rule to apply only to those situations where predeprivation process would have been impossible or impractical. In this context, an “unauthorized” state action means that the official in question did not have the power or authority to effect the deprivation, not that the act was contrary to law. See id. at 138, 110 S.Ct. 975.
Whether seen as an attack on an established state procedure or as an attack on a *434 “random and unauthorized” act, Brent-wood’s claim is not subject to the Parratt rule, as it clearly was not “impossible” for the TSSAA to grant a predeprivation hearing [18] to Brentwood on these facts. See id. at 128, 110 S.Ct. 975. It seems clear that Carter and the Board had the authority to impose the penalties against Brentwood; their acts were not “random and unauthorized.” If, as is more likely, the TSSAA’s action was the result of an “established state procedure,” then the question becomes whether that procedure violated Brentwood’s due process rights.[19]
Brentwood first argues that it was deprived of the right to a “neutral, impartial decisionmaker.” Brentwood points out that Carter acted as investigator, trial judge, initial appellate judge, and participant in the final appeal. This court, however, has rejected arguments that due process is violated when the same official plays multiple roles in the process, such as when he acts as investigator, witness, presiding officer at hearing, and final decision-maker. See Moore, 134 F.3d at 786; Du-chesne v. Williams, 849 F.2d 1004, 1005 (6th Cir.1988) (en banc); Newsome v. Ba-tavia Local Sch. Dist., 842 F.2d 920, 926-27 (6th Cir.1988). This line of argument thus fails.
In finding a violation of Brentwood’s procedural due process rights, the district court focused on Brentwood’s alternative procedural due process argument: that during the TSSAA Board of Control’s private deliberations after the August 23, 1997, hearing, the Board heard ex parte evidence regarding contacts with middle school students allegedly made on behalf of Brentwood, and that this evidence affected the Board’s final decision and penalty. Brentwood claims that it should have had the chance to rebut this evidence by cross-examining the TSSAA investigators who discussed these contacts with the Board during the private deliberations. See Goldberg v. Kelly, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (“In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses.”); see also Loudermill, 470 U.S. at 546, 105 S.Ct. 1487 (“The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement.”).
In evaluating Brentwood’s argument, it is necessary to recount in some detail the evidence about the subject of the ex parte discussion. There had been reports made to the TSSAA alleging that an Amateur *435 Athletic Union (AAU) basketball coach named Bart King urged particular middle school student athletes to attend Brent-wood, had provided transportation to Brentwood for those students, and promised scholarships to those students. Brentwood alleged in its initial complaint that King was in no way affiliated with the school and that Brentwood never represented to King or others that King had authority to act on its behalf. After the TSSAA received reports containing the allegations involving King, two TSSAA officials, Gene Meness and Bernard Childress, investigated the matter. Meness and Chil-dress met with Brentwood Headmaster Brown in early June 1997 and asked Brown about King. Brown suggested that they put questions regarding King and other issues in writing and send them to him. Through an exchange of letters during July 1997, the TSSAA informed Brent-wood that it was investigating the allegations relating to King, and Brentwood stressed to the TSSAA that King was in no way associated with Brentwood Academy. Meness and Childress did not speak to King during the investigation.
As the district court found, there was no indication from the TSSAA before the final hearing that it was still considering the Bart King allegation.[20] In fact, the district court determined that “the TSSAA and Carter misled Brentwood Academy about a person and allegation which ultimately mattered to the decision.” See Brentwood Acad., 304 F.Supp.2d at 1004 n. 29. Despite this lack of indication that King’s conduct was at issue, at the final hearing on August 23, Brentwood’s counsel Tom Nebel offered to call King as a witness, saying, “We have Bart King here to answer any questions. And it was our intention to put him on, but I don’t know if you all are interested in extending for five minutes to hear Bart King or not. He’s here if you want him.” Carter answered, “No.” Evidently this was the only discussion of King at the healing. Carter later testified that “if Brentwood Academy wanted [to call King], they could have easily done it... .The school can put on anything they want to.” Nebel later testified that he was not cut off from presenting any information he wanted to present at the hearing.
Meness and Childress were present during the Board of Control’s private deliberations following the August 23 hearing. While Childress recalled answering some questions posed by Board members, neither Meness nor Carter recalled answering any questions about Bart King. Boatd of Control President Mike Reed and Board member Michael Hammond testified that during the Board’s private session, the Board discussed the allegations surrounding King’s actions. In Reed’s initial deposition in this case, Reed was asked whether the King allegations were one of the reasons behind the Board’s ultimate finding (upon which the penalties were based, in part) that there was “[cjontact with student-athletes, initiated by Brentwood Academy, while those students were en *436 rolled at other schools.” Reed answered affirmatively. However, at trial, Reed first testified that although the King allegations were a “factor” in the discussion of the final penalty, the “final penalty did not involve Bart King”: “[W]e discussed Bart King and the situation that took place, we did, we discussed it, but the final penalty really dealt with the letter from Mr. Flatt.” When asked about his deposition testimony at trial, Reed also referred to a lack of memory in his deposition testimony and further indicated that the situation with King “was a factor in the overall penalty.” The assertion that the final penalty was not based on the King allegations was reiterated by Carter and Hammond in their testimony at trial.
The district court found that the TSSAA and Carter violated Brentwood’s procedural due process rights by considering ex parte evidence during their private deliberations on August 23, 1997. In reaching this conclusion, the district court recounted the testimony of Board of Control President Reed as well as Board members Hammond, Mickey Dunn, and Morris Rogers, all of whom indicated in their testimony that TSSAA investigators Childress and Menees provided some information to the Board regarding their findings during the private session. Additionally, the court noted that Carter testified that Carter, Meness, and Childress were all present to answer questions from the Board during the private session. The court below also pointed out that “Bart King, according to Reed, was discussed and.. .was a factor in the penalties imposed.” Id. at 1004. The court credited all of this evidence “based on the demeanor of the witnesses, the consistency of the testimony, and because the testimony is adverse to the witnesses’ interests as TSSAA Board of Control members.” Id.
The district court’s factual finding that there was discussion during the Board of Control’s deliberations about the Kang allegations was not clearly erroneous and, in fact, was well-supported by the evidence. The district court was also correct in its conclusion that Brentwood Academy did not have notice that the King matter was a possible basis for final TSSAA action against Brentwood. Whether the King issue was actually a factor in the penalties ultimately imposed is far less certain. Yet the district court was entitled to credit Reed’s deposition and trial testimony that the King issue influenced the Board’s findings and penalties over his contrary trial testimony and other evidence that the King issue was not a basis for the penalties.[21] See Fed.R.Civ.P. 52(a) (“Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.”). Thus, the finding that the King issue influenced the penalties is also not clearly erroneous.
There is no applicable precedent that describes the precise process a school such as Brentwood should receive from a state athletic association such as the TSSAA before the association imposes penalties such as the ones assessed here. Cf. Loud-ermill, 470 U.S. at 545-46, 105 S.Ct. 1487 (setting out the due process requirements for termination of tenured public employees); Goss v. Lopez, 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (setting out the due process requirements for short-term school suspensions); Morrissey v. Brewer, 408 U.S. 471, 488-89, 92 S.Ct. *437 2593, 33 L.Ed.2d 484 (1972) (setting out the due process requirements for parole revocations). The district court therefore correctly looked to the general balancing test of Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) to determine what process is due in this situation. The Mathews balancing test states:
[Identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Id. at 335, 96 S.Ct. 893.
The district court correctly concluded that in a situation such as the one presented by this case, due process requires that a school be informed of all of the issues relied on by an athletic association levying penalties against the school and be given a chance to respond to those issues before the penalties are imposed.[22] Such a requirement imposes only a minimal burden on the state actor and would be of great value in ensuring that a school is not wrongfully penalized. Moreover, as the district court noted, such a requirement is clearly consistent with the notification requirements set out by this court and others in analogous situations. See, e.g., Loudermill, 470 U.S. at 546, 105 S.Ct. 1487 (“The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer’s evidence, and an opportunity to present his side of the story.”); Moore, 134 F.3d at 786 (“[T]he process offered Moore was constitutionally sufficient. She received written notice of the charges against her, as well as an explanation of the Board [of Education]’s evidence, and was offered an opportunity to present her side of the story.”); Swank v. Smart, 898 F.2d 1247, 1253 (7th Cir.1990) (“[The police officer] was entitled to challenge the chiefs assessment of the damage caused by the [incident in which the officer was seen giving a girl a ride on his motorcycle]. Ex parte presentation of evidence denies due process.... ”); id. at 1256 (“[A] tenured public employee has a constitutional entitlement to a fair hearing before being fired and that with immaterial exceptions a fair hearing includes the right to be shown the evidence on which the tribunal has relied, including evidence pertaining to the gravity of the sanction to be imposed when liability is conceded.”) (citations omitted); Newsome, 842 F.2d at 927 (holding that student was “denied procedural due process when the superintendent disclosed to the school board, during their closed deliberations, new evidence which had not been presented during the open hearing at which Newsome and his attorney were present”); see also Greene v. McElroy, 360 U.S. 474, 496, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (“[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government’s case must be disclosed to the individual so that he has an opportunity to show that it is untrue.”).
*438 In sum, we affirm the district court’s conclusion that the TSSAA and Carter violated Brentwood’s procedural due process rights. The district court correctly determined what process was due to Brent-wood: notice of the evidence relied upon in penalizing Brentwood and an opportunity to respond to that evidence before penalties were imposed. Here, the TSSAA failed to give that notice as it related to King. Brentwood therefore had no notice that it should respond to the King evidence at the hearings. Yet, the King evidence was used by the TSSAA in its deliberations and, under the district court’s findings, influenced the penalties imposed on Brentwood. The failure to afford the requisite process violated Brentwood’s Fourteenth Amendment rights to procedural due process.
E. Availability of Qualified Immunity for Carter
The district court also held that Carter was not entitled to qualified immunity. Whether a defendant is entitled to qualified immunity is a question of law reviewed de novo. Thacker v. City of Columbus, 328 F.3d 244, 259 (6th Cir.2003). Qualified immunity protects government officials from civil liability for actions taken within their official discretion insofar as these actions do not violate clearly established statutory or constitutional- rights of which a reasonable official would have been aware. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It is not merely a defense to liability; rather, when applicable, qualified immunity protects government officials from lawsuits and, hence, the burdens of litigation. See Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
The initial question here is whether the qualified immunity defense is even available to Carter, an employee of a non-profit corporation that has been found to be a state actor when engaging in regulatory activity. “In assessing whether the qualified immunity afforded state officials extends to private actors who are considered state actors under § 1983, [the court] must consider both the purposes of qualified immunity protection and the nature of the relationship between the state and the putative private party.” Bartell v. Lohiser, 215 F.3d 550, 556 (6th Cir.2000). This court held in Bartell that workers for a non-profit foster-care corporation that had contracted with the government and was closely supervised by a state agency were entitled to qualified immunity. Id. at 557. The Bartell court distinguished Richardson v. McKnight, 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), in which the Supreme Court held that private prison guards were not entitled to qualified immunity, as involving a for-profit corporation that operated with limited direct supervision by the government. See Bartell, 215 F.3d at 556-57 (citing Richardson, 521 U.S. at 413, 117 S.Ct. 2100). Here, one of these factors weighs in favor of Carter (because the TSSAA is a non-profit corporation) and one weighs in favor of Brentwood (because the TSSAA operates with limited direct governmental supervision).
Nevertheless, a closer examination of Bartell and Richardson indicates that the balance is tipped towards Carter’s argument that qualified immunity is available to him. Specifically, one of the key reasons qualified immunity was unavailable in Richardson was because the purposes of qualified immunity were already served by “marketplace pressures” that themselves “provide[d] the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or ‘nonar-duous’ employee job performance.” 521 *439 U.S. at 410, 117 S.Ct. 2100. Here, there are no such marketplace pressures; the TSSAA, unlike the prison firm in Richardson, does not have to compete with other firms for the job it does on behalf of the state. Also, the Richardson court relied heavily on the fact that “[hjistory does not reveal a ‘firmly rooted’ tradition of immunity applicable to privately employed prison guards.” Id. at 404, 117 S.Ct. 2100 (citing Wyatt v. Cole, 504 U.S. 158, 164, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992)). The district court in this case picked up on this rationale, noting that “[jjudicial history does not reveal a firmly rooted tradition of immunity applicable to employees of private athletic associations.” The notion that there would be such a “firmly rooted” history, though, is unreasonable in the first place, considering that athletic associations like the TSSAA have only recently grown in importance and stature, and litigation involving such associations has been relatively rare. See Brentwood Acad., 531 U.S. at 304, 121 S.Ct. 924 (“No one.. .has pointed to any explosion of § 1983 cases against interscholastic athletic associations .... ”); see also Richardson, 521 U.S. at 414-15, 117 S.Ct. 2100 (Scalia, J., dissenting) (chiding the Richardson majority for relying on the historical absence of any cases in which immunity was successfully asserted by a private prison guard). We find that qualified immunity is available to officials such as Carter.
Having found that qualified immunity is available to Carter, the next question is whether it ápplies in this ease. If an official acts within his discretionary authority and asserts qualified immunity, the burden shifts to the plaintiff to prove that the officer violated a right so clearly established that any reasonable official in his position would have understood it was unlawful to engage in the conduct that violated the right. See Gardenhire v. Schubert, 205 F.3d 303, 311 (6th Cir.2000). This court evaluates this burden according to a three-prong standard. See Williams v. Mehra, 186 F.3d 685, 691 (6th Cir.1999). First, the court considers whether a constitutional or statutory violation occurred. Id. If so, the court then considers whether the right that was violated was clearly established in the sense that a reasonable person would have known of the right. Id. The right must have been “clearly established at the time of the actions in question.” Dickerson v. McClellan, 101 F.3d 1151, 1158 (6th Cir.1996). If the right was clearly established, the court’s third step is to “determine whether the plaintiff has alleged sufficient facts, and-supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.” Williams, 186 F.3d at 691.
Having found that a violation of Brent-wood’s procedural due process rights occurred, the next question is whether Brentwood’s rights were clearly established such that “it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier, 533 U.S. at 202, 121 S.Ct. 2151. On this point, there is simply no support for the district court’s conclusion that “the contours of procedural due process were sufficiently clear and apparent that Carter had fair warning, and reasonably should have understood, that what he did violated the procedural' due process rights of Brentwood Academy.” As described above, there is no applicable authority describing what process state secondary athletic associations must provide when enforcing their regulations. It asks too much of Carter to expect him to have applied the Mathews factors and concluded that failing to give notice that the King issue would be considered and then considering it during the Board’s private de *440 liberations would violate Brentwood’s due process rights. Regardless of Carter’s extensive involvement in the investigation and decision making with regard to the TSSAA’s penalties against Brentwood, there is no evidence that his conduct was objectively unreasonable, or that Brent-wood’s due process rights (or First Amendment rights, for that matter) in this context were clearly established. For these reasons, we reverse the district court on this issue and find that Carter is entitled to qualified" immunity.
F. Antitrust Immunity
The district court ruled in an October 2002 order that the TSSAA was entitled to antitrust immunity under the doctrine of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Brent-wood appeals from this order, arguing that the doctrine does not apply and that its antitrust claim should be permitted to proceed.[23]
In addition to the facts noted earlier about the TSSAA as an organization, the following facts are pertinent to the antitrust immunity inquiry. The bulk of the TSSAA’s revenues come from gate receipts at member teams’ tournaments, but member schools do pay annual dues. TSSAA employees are not paid by the state but are eligible to join the state employee retirement system. The voting membership of the Board of Control and Legislative Council (the rulemaking body of the TSSAA) are composed of school administrators, and the public school administrators who typically serve in these positions carry out their TSSAA duties during regular school hours.
The district court issued only a cursory explanation of its decision on this issue. The court explained, without analysis, that the Supreme Court’s decision on “pervasive entwinement” meant that the TSSAA was a state actor “for purposes of antitrust immunity.” However, while there are similarities between the two tests, the Parker antitrust immunity inquiry is different from the inquiry into whether state action exists for the purposes of § 1983 and the Fourteenth Amendment. See Nat’l Collegiate Athletic Ass’n v. Tarkanian, 488 U.S. 179, 194 n. 14, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988) (noting that the two inquiries are “somewhat similar” but “by no means identical”); Tarabishi v. McAlester Reg’l Hosp., 951 F.2d 1558, 1565 n. 6 (10th Cir.1991). Indeed, the extensive case law on the issue of Parker antitrust immunity reveals that the doctrine does not apply to the TSSAA.
In Parker, the Supreme Court held that when a “state in adopting and enforcing [a regulatory] program..., as sovereign, imposed the restraint as an act of government,” the program could not violate the Sherman Act, because the Act was directed against “individual and not state action.” 317 U.S. at 352, 63 S.Ct. 307; see also City of N. Olmsted v. Greater Cleveland Reg’l Transit Auth., 722 F.2d 1284, 1287 (6th Cir.1983) (“[The] doctrine enunciated in Parker ... exempt[s] ‘anticompet-itive conduct engaged in as an act of government by the state as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service’ from Sherman Act control.”) (quoting City of Lafayette v. La. Power & Light Co., 435 U.S. 389, 413, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (opin *441 ion of Brennan, J.)) (emphasis removed). The Court has clarified that while Parker immunity clearly applies to a state legislature or a state supreme court acting in its legislative capacity, when the regulatory activity is carried out by others pursuant to state authorization, the program must meet the two-part standard set out in California Retail Liquor Dealers Ass’n v. Midcal Aluminum, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). See Hoover v. Ronwin, 466 U.S. 558, 567-68, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). “First, the challenged restraint must be ‘one clearly articulated and affirmatively expressed as state policy’; second, the policy must be ‘actively supervised’ by the State itself.” Midcal Aluminum, 445 U.S. at 105, 100 S.Ct. 937 (quoting City of Lafayette, 435 U.S. at 410, 98 S.Ct. 1123 (opinion of Brennan, J.)).[24] Like other judicially imposed exemptions from the antitrust laws, the Parker doctrine must be narrowly construed. See FTC v. Ticor Title Ins. Co., 504 U.S. 621, 636, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992).
The first question under the Midcal Aluminum test is whether the TSSAA acts pursuant to a “clearly articulated and affirmatively expressed” state policy to displace competition. 445 U.S. at 105, 100 S.Ct. 937. This policy must be one clearly articulated in the first instance not by a state agency, see Goldfarb v. Va. State Bar, 421 U.S. 773, 790, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), but by “the State itself, such as a policy approved by a state legislature... or a State Supreme Court,” see S. Motor Carriers Rate Conference, Inc. v. United States, 471 U.S. 48, 63, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (citations omitted). The “clearly articulated” state policy requirement is not satisfied “when the State’s position is one of mere neutrality respecting the municipal actions challenged as anticompetitive.” Cmty. Communications Co. v. City of Boulder, 455 U.S. 40, 55, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). In City of Boulder, the Court held that the Parker doctrine did not protect a municipality’s regulation of the cable television market, even if the city’s activities were authorized by a home rule statute, because the “general grant of power to enact ordinances” did not imply “state authorization to enact specific anticompetitive ordinances.” Id. at 56, 102 S.Ct. 835. On the basis of this rationale, the TSSAA should not receive antitrust immunity. The Tennessee General Assembly has done nothing more than delegate to the State Board of Education the general authority to develop policies for the operation of public schools. Tenn.Code Ann. § 49-1-302. The state statute says nothing about interscholastic athletics or the TSSAA itself, which acts under the auspices of the Board. See Brentwood Acad., 531 U.S. at 292-93, 121 S.Ct. 924. The Tennessee statute represents a vague, neutral authorization by the sovereign; this is not enough to establish a “clearly articulated and affirmatively expressed” state anticompetitive policy. Midcal Aluminum, 445 U.S. at 105, 100 S.Ct. 937; see also Mich. Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir.2002) (“Grants of general or neutral authority to govern local affairs will not satisfy the ‘clear articulation’ component of the state action exemption from antitrust liability.”).
*442 Other Supreme Court precedent, however, suggests that “ ‘explicit authorization’ by state legislatures to displace competition [is] not necessary to pass the clear articulation test. The Parker exemption applies as long as the suppression of competition is the foreseeable or logical result of what the state authorizes.” Id. at 535 (citing Town of Hallie v. City of Eau Claire, 471 U.S. 34, 42-44, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985)). In Town of Hallie, a city refused to supply sewage treatment facilities to those outside the city’s borders. 471 U.S. at 37, 105 S.Ct. 1713. The state statute did not refer to competition, but it authorized the city to refuse to provide sewage treatment to adjacent unincorporated areas unless they agreed to annexation. Id. at 41, 105 S.Ct. 1713. The Court held that “anticompetitive effects logically would result from this broad authority to regulate” and thus the first prong of the Midcal Aluminum test was met. Id. at 42, 105 S.Ct. 1713. Town of Hallie is distinguishable, however^ since although the state statute in that case did not explicitly authorize anticompetitive state behavior, it specifically described and authorized the policy in question. Here, not only does the Tennessee statute fail to authorize anything like the recruiting rule or any other regulation, but it also fails to mention interscholastic athletics at all. The state as sovereign has not made clear its intent to establish an anticompetitive regulatory program. Cf. S. Motor Carriers Rate Conference, 471 U.S. at 63-64, 105 S.Ct. 1721 (“The legislature thus made clear its intent that intrastate rates would be determined by a regulatory agency, rather than by the market.”); Mich. Paytel, 287 F.3d at 536 (holding that anticompetitive effects are “the logical and foreseeable result of the City’s broad authority under state law and the Michigan Constitution to bid out public contracts for the maintenance of City prisons”).
Assuming, arguendo, that the TSSAA acts pursuant to a “clearly articulated and affirmatively expressed” anticompetitive state policy, the next question is whether its regulatory program is actively supervised by the state. See Midcal Aluminum, 445 U.S. at 105, 100 S.Ct. 937.[25] This court has held that the active supervision requirement must be met by state supervision; “municipal oversight” of the program is insufficient. See Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp., 774 F.2d 162, 163 (6th Cir.1985). Significantly, this court has also held that antitrust immunity does not apply to a private actor to whom authority is delegated such that the private actor becomes the “effective decision maker.” See Mich. Paytel, 287 F.3d at 537-38. In these situations, when a private actor (such as a non-profit corporation) acts on behalf of the state but makes “ ‘independent decisions without the input, advice, involvement, or oversight of.. .any.. .governmental body,’ ” antitrust immunity does not *443 apply. Id. at 538 (quoting Riverview Invs., Inc. v. Ottawa Cmty. Improvement Corp., 899 F.2d 474, 481-82 (6th Cir.1990)); see also Town of Hallie, 471 U.S. at 47, 105 S.Ct. 1713 (“Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.”). Here, authority was clearly delegated from the state to the State Board of Education and then, in turn, to the TSSAA. There is nothing at all in the record to indicate that the state is actively involved in supervising the TSSAA. In fact, the evidence suggests that the opposite is the case. See also Midcal Aluminum, 445 U.S. at 106, 100 S.Ct. 937 (“The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.”).[26]
Defendants therefore cannot establish either prong of the Midcal Aluminum test. For these reasons, we reverse the district court’s October 2002 decision finding that the TSSAA is entitled to Parker antitrust immunity and remand for further proceedings with respect to Brentwood’s antitrust claim.
G. Relief Issues
Brentwood also appeals the district court’s denial of damages. “[W]hen § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts.” Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 306, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). “[P]roximate causation is an essential element of a § 1983 claim for damages. That is, a violation of a federally secured right is remediable in damages only upon proof that the violation proximately caused injury.” Horn v. Madison County Fiscal Court, 22 F.3d 653, 659 (6th Cir.1994) (internal citation omitted). The district court found that the damages claimed by Brent-wood (reputational harms and time spent by employees on the case) were not proximately caused by the defendants. On appeal, Brentwood argues that the district court should have considered whether the damages were “foreseeable” and that the harms suffered by Brentwood were foreseeable consequences of the defendants’ conduct.
The district court rightly pointed out that any costs incurred by Brentwood as a result of the litigation were costs it chose to incur when it filed the case. As to Brentwood’s reputational damage, foreseeability is an element of the proximate cause analysis, but it is distinct from the requirement that a plaintiff show *444 the injury was directly caused by the defendant. See Perry v. Am. Tobacco Co., 324 F.3d 845, 850-51 (6th Cir.2003). It is a fundamental tort law principle that while an injury to a plaintiff might be foreseeable, the damages incurred could still be “too remote to permit recovery.” See, e.g., Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 236 (2d Cir.1999). Here, the district court sensibly concluded that even if Brentwood’s reputational harms were foreseeable, they could be traced much more directly to the media and other third-party actors than to the TSSAA or Carter.
Brentwood also argues that the district court, which enjoined the penalties assessed against Brentwood, should have also enjoined the enforcement of the recruiting rule “as applied to speech more generally.” Brentwood asserts in its brief that “[o]nly a decision-forcing injunction against applying the [recruiting rule] to speech can assure TSSAA’s First-Amendmenb-mandated ‘careful calculation of the speech interests involved.’ ” These arguments are not well-taken. In its previous opinion, this court clearly rejected a facial challenge to the recruiting rule based on an argument that the regulation was invalid in all of its applications. Brentwood Acad., 262 F.3d at 554-57. The court suggested that the recruiting rule could in fact be applied constitutionally in some cases, and the district court’s task on remand was to consider only whether the rule was constitutional as applied to Brentwood. Id. at 554-58. The district court correctly limited its remedy accordingly and enjoined only the application of the rule to Brentwood in this case.[27] We affirm the remedy granted by the district court.
III.
For the foregoing reasons, we: (1) affirm those parts of the district court’s decision finding for Brentwood on its First Amendment and procedural due process claims and granting injunctive relief on these claims; (2) reverse the district court’s decision finding for Brentwood on its substantive due process claim; (3) reverse the district court’s decision finding that Carter is not entitled to qualified immunity; (4) reverse the district court’s order finding that the TSSAA is entitled to antitrust immunity; and (5) remand for further proceedings on Brentwood’s antitrust claim.

. Headmaster Brown later testified that those students who sign such contracts (and paid the accompanying $300 deposit), in his mind, were officially enrolled at Brentwood and committed to come. The TSSAA, however, contends that the term "enrolled” (as used in the recruiting rule) is defined in the TSSAA Bylaws, under Article II (Eligibility Rules), Section 1 (Academic Rules):
To be eligible to participate in athletic contests during any semester....
(b) Students shall be regularly enrolled, in regular attendance, and carrying at least five full courses. A student shall be considered as regularly enrolled after the student has attended for three days, has engaged in three or more days of football, girls volleyball, cross country, golf or girls soccer practice during the period on or after August 1, or has participated in an athletic contest in any sport.
There was some testimony at trial indicating that a few students every year do not end up attending Brentwood even after signing the enrollment contracts.

. To be clear, the alleged violation of the recruiting rule was the invitation to attend football practice, not the practice itself. It is undisputed that in 1997, participation by incoming Brentwood students in spring football practice was permissible under TSSAA rules. The rule was subsequently changed to prohibit such participation.

. Brentwood did not appeal the district court’s conclusions regarding Brentwood's equal protection or state law claims. Nor did it appeal the district court's dismissal of Brentwood's First Amendment and substantive due process claims against Carter in his individual capacity.

. For the sake of convenience and clarity, we refer to the defendants collectively as "TSSAA” throughout this section of the opinion.

. It is interesting to note that the TSSAA, in its first appeal to this court, challenged the “analytical framework that the district court used” in its initial decision. Brentwood Acad., 262 F.3d at 551. We agreed with the TSSAA the last time around, holding that “the district court erred in concluding that the recruiting rule is a content-based regulation that fails strict scrutiny review” and that, rather, the recruiting rule is content-neutral and subject to intermediate scrutiny. Id. at 551-53. In this appeal, however, we cannot agree with the TSSAA's challenge to the analytical framework governing the case and set out by this court previously.

. Edenfield and Thompson are commercial speech cases, but the test they apply, just like the test applicable here, asks the court to determine whether the asserted state interests are substantial. See Cent. Hudson Gas & Elec. Corp. v. Tub. Serv. Comm’n, 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

. Mostly, however, Brentwood conflates the "substantial interest” prong of the intermediate scrutiny test with the “narrowly tailored” prong, conceding later in its brief that the "TSSAA has a substantial interest in preventing exploitation of students,” defined as "a student.. .being threatened, coerced, or harassed.” Brentwood's argument that there are "problems with this theory.. .as a justification for TSSAA's disciplinary action” against Brentwood is evaluated in the next section of this opinion, since this is an argument that the application of the rule was not "narrowly tailored” to further Brentwood's legitimate and substantial interests.

. Despite our conclusion that the district court correctly found that the TSSAA had established substantial state interests in keeping athletics subordinate to academics and preventing the exploitation of student athletes, the dissent devotes considerable attention to a discussion of the type of proof a defendant might have to present to support such interests. The two opinions do not differ on the ultimate point, that is, the TSSAA did have substantial state interests at stake. The true point of departure is whether the rule "as applied to Brentwood” is narrowly tailored to further those interests. See Brentwood Academy, 262 F.3d at 557.

. The "two alleged recruiting rule violations” referred to here are: (1) the free game tickets and (2) the spring practice letters and followup calls. See Brentwood Acad., 262 F.3d at 548. While this court's previous opinion considered both of these rule violations as bases for Brentwood's First Amendment claim, neither the initial district court opinion nor the opinion being appealed here applied First Amendment scrutiny to the application of the recruiting rule to the free game tickets episode. In both opinions, the district court considered only whether the application of the rule to the letters and phone calls was constitutional. Defendants state in their brief *428 that "[ojnly the spring practice letters and phone calls formed the basis of [BrentwoodJ's First Amendment claim.”
The disconnect between this court's previous opinion and the district court's opinions on this point is likely due to the fact that, judging from its brief, Brentwood has focused its First Amendment claim on the punishment for the letters and calls, recognizing, perhaps, that it is unclear whether the First Amendment is implicated by the provision of free game tickets. Regardless, we confine our “narrowly tailored” inquiry to the letters and calls, leaving the free tickets episode to be considered under substantive due process analysis.

. Even though the district court found that fostering a level playing field was not a substantial state interest, it nonetheless included the interest in its "narrowly tailored” analysis.

. It is worth noting again that the district court’s task was to consider the application of the recruiting rule specifically to Brentwood on these facts. The district court's opinion does not mean that application of the recruiting rule to other schools communicating in similar ways to students would be unconstitutional. For example, it is possible that letters and calls similar to the ones at issue here would be exploitative in a different context.

. That the rule was subsequently changed to prevent such participation in spring practice bolsters the conclusion that the TSSAA’s punishment of Brentwood in this case was not narrowly tailored. Banning spring practice participation, rather than applying the recruiting rule punitively to Brentwood's invitation to participate in the approved activity, would have been a more narrowly tailored way to promote the TSSAA’s substantial interests. See Thompson, 535 U.S. at 373, 122 S.Ct. 1497 (''[R]egulating speech must be a last — not first — resort. Yet here it seems to have been the first strategy the Government thought to tiy.”).

. Headmaster Brown testified:
[A]s far as enrollment, we had to deal with our kids to get them acclimated to the school before they came. It would be— there's no way that they could start with no contact from the school before. I mean that's part of what all schools do. I mean they have got to get reading lists, got to know about the picnics, got to know about the options in the summer retreat, work options, and" all of that so we have to communicate with them.
Admissions Director Brasher noted that admission is generally granted in November or February of the previous school year, and after a student is admitted and signs the enrollment contract, the student receives a packet of information, including a letter from the admission director, the student-parent agreement, and the handbook for Brentwood Academy with policies and procedures. Also, once an enrollment contract is signed, that student’s family is put on the school’s general mailing list, and they receive all the information that is sent to current students. Brasher provided more details:
We have a mailing that goes out usually about the end of May that will include reading list, letters from the English teachers, information about our summer session which includes summer school, computer camps, drama camps, athletic camp, driver’s ed. We have arts in April, it’s a big fine arts venue in April and we send them information on that.
*430 Brasher also noted that there are some mailings that are targeted to particular groups of students, such as a letter about cheerleading tryouts that is sent only to girls.

. This court's previous opinion supports this conclusion. In determining that the recruiting rule is content-neutral, rather than content-based, this court pointed out that the recruiting rule does not impose a "total ban...on communications between secondary schools and middle school athletes regarding high school athletics.” Brentwood Acad., 262 F.3d at 551-52. According to the court's opinion, the greatest restriction im *431 posed by the rule is the "prohibition on coaches... from initiating contact with middle school students for the purpose of recruiting student athletes." Id. at 552 (emphasis added). The rule allows "numerous ways in which Brentwood can get its message about athletics out to prospective students,” as evidenced by the letter written by Brentwood's lawyer to the TSSAA in 1993 detailing Brent-wood’s understanding of various acceptable modes of communication. Id. On remand, the district court determined that applying the rule to the letters and calls was unconstitutional, since the application of the rule to the letters and calls was not narrowly tailored to further the TSSAA's substantial interests. Under the terms of this court's previous opinion, one could also read the district court opinion as a suggestion that the communications either were not made for the purpose of recruiting student athletes, or fell under the category of acceptable modes of communication under the recruiting rule, or both.

. The dissenting opinion's approach to this aspect of the case departs from a record-based analysis of whether the application of the recruiting rule to Brentwood was narrowly tailored to serve the TSSAA’s substantial interests. In doing so, it neglects consideration of the evidentiary record, a process that an as-applied challenge necessarily entails, and substitutes theoretical analogies between recruiting rules and restrictions on adult-oriented businesses. While the dissent’s approach might be appropriate in cases involving facial challenges to a regulation, such as Renton and Ward, on which the dissent heavily relies, it is inconsistent with the proper analysis for an as-applied challenge. See Taxpayers for Vincent, 466 U.S. at 796, 803, 104 S.Ct. 2118 (distinguishing between a facial challenge and an as-applied challenge and concluding, after determining that the appel-lee could not establish that the law is "unconstitutional in every conceivable application, or.. .seeks to prohibit such a broad range of protected conduct that it is unconstitutionally ‘overbroad,’ " that the challenge was "basically a challenge to the ordinance as applied to [the appellee's] activities,” and therefore "limit[ed] [the Court's] analysis of the constitutionality of the ordinance to the concrete case before [it]”); cf. Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (noting that litigants bring a facial challenge where they attack "a statute not because their own rights of free expression are violated, but because.. .the statute’s very existence may cause others not before the court to refrain from constitutionally protected speech”).
The dissenting opinion's only arguable reference to the trial court record on the issue of whether application of the rule to Brentwood was narrowly tailored to serve the TSSAA’s substantial interests is its suggestion that the rule permitted Brentwood to distribute its letters to private athletic leagues and other schools and permitted Brentwood coaching staff to refer potential students who contacted them to other Brentwood officials. The dissent deems these options alternative channels for communication. While these options are presumably permissible (but not mentioned in the evidence), they are hardly viable alternatives for achieving Brentwood's purpose and communicating the information contained in the letters to incoming students. The dissent's noting of these options is another way of saying that the recruiting rule did not prohibit Brentwood from advertising its sports and other offerings to the world at large through any available public medium, but that fact has little if anything to do with whether the recruiting rule as applied to Brentwood was narrowly tailored to serve the TSSAA's substantial interests.

. Brentwood’s initial complaint lumps together a number of justifications for its claim that TSSAA violated its substantive due process rights. For instance, Brentwood claims that the recruiting rule infringed on liberty interests of students and parents to choose their schools, the recruiting rule is too vague, and the rule is fundamentally unfair in that Brentwood was punished for actions of a person beyond its control. The third argument is better analyzed as a procedural due process claim and is considered infra. Cf. County of Sacramento v. Lewis, 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (holding that substantive due process precludes certain government actions "regardless of the fairness of the procedures used to implement them”) (citation omitted).

. The fundamental right to educate one's own children, see Pierce v. Soc’y of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), is not at issue, especially since the regulation and penalties were applied only against Brentwood, not against the parents of the children involved.

. The district court stated that Brentwood was deprived of its property interests immediately upon issuance of the July 29, 1997, letter, simply because the letter itself said the penalties were effective immediately. See Brentwood Acad., 304 F.Supp.2d at 1005. The hearings held after this date, the court reasoned, were therefore postdeprivation hearings, which under certain Supreme Court precedent, must be more extensive and thorough than predeprivation hearings. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 545, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). This conclusion by the district court seems wrong, as Brentwood did not pay the $3,000 fine, and it appealed the July 29, 1997, decision precisely so it would not have to pay the fine or be subject to any other penalty. Brentwood had thus not been "deprived” of its property by August 23, when the final hearing was held. Cf. id. at 545-46, 105 S.Ct. 1487 (drawing the deprivation line at the moment of termination of employment). In any event, it is immaterial to the analysis in this case whether the hearing process occurred predeprivation or postdeprivation.

. Even if the acts were "random and unauthorized,” and the Parratt rule did apply, the ultimate issue would be this same question: whether the procedure provided (the hearings in front of the Board of Control) was adequate. See Macene, 951 F.2d at 706.

. Carter's July 29, 1997, letter to Brown details six ''concerns” and violations on which the penalties are based. Only the sixth concern, which obliquely refers to contacts "by persons not connected with Brentwood Academy,” arguably has anything to do with King. The violation listed under concern six, however, gives no indication that the TSSAA seeks to assign any responsibility to Brent-wood for any actions by King. At the first hearing on August 13, 1997, Brentwood submitted an affidavit from King denying the allegations detailed in the earlier exchange of correspondence between the TSSAA and Brentwood. Then, after the first hearing, Carter sent Brown a letter dated August 14, 1997, listing the violations found at the first hearing. None of these violations implicates King in any way.

. Reed's deposition testimony is a prior inconsistent statement given under oath and also amounts to an admission against interest on the part of the TSSAA. Fed.R.Evid. 801(d)(1) & (2).

. The TSSAA complains that the district court "once again’' ignored the contractual relationship between it and Brentwood in evaluating the procedural due process claim, but fails to articulate exactly how the contractual relationship lessens the TSSAA's obligation as a state actor to provide procedural due process.

. In its brief the TSSAA argues a number of issues relating to the antitrust claim. Before the district court, however, it raised only the antitrust immunity issue, and we will therefore not consider the other issues on appeal. See Barner v. Pilkington N. Am., Inc., 399 F.3d 745, 749 (6th Cir.2005).

. In Midcal Aluminum, the Court held that a California price-setting system for wine met the first but not the second prong of the test, because the state simply authorized the price setting and enforced the prices established by private parties. 445 U.S. at 105, 100 S.Ct. 937. The State did not monitor market conditions or otherwise actively supervise the program. Id. at 105-06, 100 S.Ct. 937. Therefore, California's involvement was not sufficient to establish Parker immunity. Id.

. A threshold question before reaching this second prong of the test is whether the second prong applies to the TSSAA. Town of Hallie stands for the proposition that the active state supervision requirement is not applicable in cases where the actor is a municipality, and the Court suggested in dicta in that case that the same should go for cases in which the actor is a “state agency.” See 471 U.S. at 46, 105 S.Ct. 1713 n. 10. In their brief, defendants cite a number of cases to support their argument that the TSSAA qualifies as a political subdivision of the state for antitrust purposes and therefore need not meet the second prong of the Midcal Aluminum test. However, none of these cases concern an athletic association such as the TSSAA, and defendants cite no case from this circuit to support their argument. In fact, circuit precedent suggests that it is only municipalities that are exempt from the second prong of the test. See Mich. Paytel, 287 F.3d at 536 (holding that "private parties must establish both” elements of the Midcal Aluminum test).

. The dissent rests its differing result on our decision in Consolidated Television Cable Service, Inc. v. City of Frankfort, 857 F.2d 354 (6th Cir.1988). Based on the ruling in that case, it concludes’that the TSSAA is the agent of the Tennessee Board of Education, itself a state agency, and that the TSSAA need only meet the state antitrust immunity test for state political subdivisions. The relationship between the municipality and its agent cable television company in Consolidated, however, is not analogous to the relationship between the Board and the TSSAA. Frankfort provided cable television service to its citizens and owned the system for providing the service, created the cable company to operate the system, and exercised continued supervisory control over the cable company — described by the court as "ultimate control.” Id. at 358. In fact, Consolidated itself had previously described the cable company as an agent of the municipality, a fact which the court mentioned as dicta but which nevertheless appears important to the resolution. The TSSAA, with its mix of public and private membership and revenue, its elaborate internal governance and appeal structure, and its lack of state supervision does not fit within the cable company model described in Consolidated.

. In its brief, Brentwood argues that the district court’s injunction should also be directed at Carter in his official capacity. It is unclear why Brentwood makes this argument or why this should be the case, as the injunction enjoins all of the penalties imposed by the TSSAA against Brentwood. The injunc-tive relief was thus complete.