NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0824n.06
Filed: November 9, 2006

Case No. 05-1637

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ROYAL OAK ENTERTAINMENT, LLC.; MURRAY HODGSON; ROYAL OAK THEATRE, LLC.; PETER HENDRICKSON; NEW PROMO, LLC, | ) ) ) ) ) | |
| Plaintiffs-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| CITY OF ROYAL OAK, MICHIGAN; JAMES MARCINKOWSKI; CHARLES SEMCHENA; DONALD FOSTER; T.J. BERRINGTON; TERRY DRINKWINE; MICHAEL ANDRZEJAK; CARLO GINOTTI; ILENE LANFEAR; JEANNE SARNACKI; RODNEY KETEYIAN, | ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) ) ) | |

BEFORE:  KEITH and BATCHELDER, Circuit Judges; ALDRICH[*], District Judge.

ALICE M. BATCHELDER, Circuit Judge.  Plaintiffs Royal Oak Entertainment, LLC ("ROE"), Royal Oak Theatre, LLC ("ROT"), Murray Hodgson ("Hodgson"), and Peter Hendrickson ("Hendrickson") (collectively, "Plaintiffs") appeal the judgment of the district court granting Defendant City of Royal Oak, Michigan ("Royal Oak") and several of its employees and members of its City Commission and City Liquor Control Commission Committee ("Committee")

_____

[*]The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

(collectively, "Defendants") summary judgment on Plaintiffs' claims brought under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), 42 U.S.C. § 1986, and 18 U.S.C. §§ 1961 and 1962. We will affirm the judgment of the district court dismissing the Plaintiffs' federal claims, in part for the reasons given by the district court, and in part on other grounds.

## I. Statement of Facts

Nobody in Particular Presents ("NIPP"), which is not a party to this action, purchased the Royal Oak Music Theater ("the Theater"), located in Royal Oak, Michigan, and the Theater's liquor license, at a bankruptcy sale some time before 2000. NIPP thereafter obtained the City's approval of a plan of operation ("PO") for the Theater, and for a time operated the Theater itself. In the fall of 2002, Hodgson and Hendrickson began negotiating with NIPP for the purchase of the Theater, including the liquor license, the Sunday sales permit and the dance permit. In anticipation of the sale – and without ever having requested that the liquor license be transferred – Hodgson submitted a PO to the Committee on May 28, 2003, stating that he was doing business as "Royal Oak Music Theater" on behalf of "an entity to be formed." The Committee voted to set this PO for a public hearing on June 26, 2003. For reasons not explained by the parties and certainly not clear from the record, the minutes of the Committee state that the public hearing would be set for June 26, 2003, but the minutes of the hearing itself indicate that it was held on June 25, 2003.

On June 24, 2003, Sergeant T.J. Berrington ("Berrington") of the Royal Oak Police Department ("ROPD") sent a memorandum to his superiors regarding a nightclub called "Space" that Hodgson had operated in Detroit. The memorandum contained information – apparently derived from Berrington's conversations with members of the Detroit Police Department and from two newspaper articles – indicating that there were 19 assault and battery reports stemming from

2

incidents at Space, mostly concerning bouncers' assaulting customers. Berrington's memorandum was forwarded to Deputy Chief Wightman ("Wightman") and then to Police Chief Quisenberry ("Quisenberry"). Wightman also included his own memorandum reiterating that there were 19 assault and battery reports resulting from incidents at Space.

Before the June 25th hearing, Hodgson submitted a new PO; it is this PO that was discussed at the hearing on June 25. At that hearing, Deputy City Attorney James Marcinkowski ("Marcinkowski") advised the Committee that POs are not subject to public hearing, so the Committee voted to continue the hearing until July 15. On July 4, Hodgson wrote an email to Quisenberry in order to set the record straight regarding the information contained in the June 24 memorandum, stating that 12 of the 19 assaults that allegedly occurred at Space in fact occurred after Space had closed. Hodgson sent another email to Quisenberry on July 10, complaining that Donald Foster ("Foster") of the ROPD refused to meet with him in order to hear his side of the story.

The next day, Foster sent Quisenberry a report entitled "Space Nightclub Background Investigation (2nd Part)," which Plaintiffs assert was made available to the public and the media before the Plaintiffs were allowed to see it. The report was not flattering from Plaintiffs' perspective. It quoted a newspaper article describing Space as having "mind-altering lights," which it connected with possible use of the drug "ecstasy" at the club, but it also summarized interviews with neighbors of Space and news investigators, all of whom reported that Space was well-run and a good neighbor. A section entitled "Word on the Street" included nine unattributed quotes, supposedly provided by people on the "streets of Detroit in area of Space," all of which cast Space in a negative light from a law-enforcement perspective. The final section of the report again stated that there had been 19 criminal reports stemming from incidents at Space, and additionally linked a murder to the club by

3

stating that the suspect and victim had been arguing inside Space and that the shooting occurred in the Space parking lot.[1] Hodgson was eventually vindicated to some extent when an investigator from the Detroit Police Department sent a letter to Hodgson admitting that "[a]t no time has [sic] warrants been issued or bouncers been investigated for any alleged crimes at Space Night Club."

The July 15th public hearing went forward as scheduled, and Hodgson told the Committee that, if NIPP's liquor license was ever transferred, it would be transferred to ROT, which Hendrickson owns. The Committee voted to recommend that the PO be denied because neither Hodgson, Hendrickson, nor ROT owned a valid liquor license, and none of them had applied for a new license or the transfer of a new license into Royal Oak. In the Committee's view, the City's ordinances did not permit a non-licensed party – other than an applicant for a new license or for transfer into the City of a new license – to submit a PO.

On July 24, 2003, ROE and NIPP entered into a management agreement for the Theater which provided that NIPP would operate the Theater until all licenses and permits were transferred to ROE, at which time ROE would take over management. About the same time, Hendrickson submitted a request that NIPP's liquor license be transferred to ROT. On August 1, Marcinkowski drafted two proposed resolutions for the Committee to adopt, stating "BE IT RESOLVED that the request of 'Space' and/or Murray Hodgson to operate the Royal Oak Music Theatre (318 West Fourth Street) is denied" and "BE IT FURTHER RESOLVED that the proposed plan of operation of 'Space' and/or Murray Hodgson is denied." The Committee adopted both resolutions at its August 4th meeting.

---

[1]The report appears to be mistaken, as the shooting allegedly took place on January 16, 2000, but Space did not open its doors until December of that year, and the shooting in fact took place in the parking lot of the Sweet Water Tavern, an unrelated business.

Two days later, Marcinkowski sent a letter to Julie Wendt, Director of Licensing for the Michigan Liquor Control Commission ("MLCC"), informing her that the Committee had passed a resolution denying Hodgson's request to operate the Theater. He sent another letter on August 12th, telling her about the management agreement between NIPP and ROE. The MLCC wrote to Hendrickson on August 11th, telling him not to invest any money in renovating the Theater until the transfer of the liquor license from NIPP to ROT was approved. The ROE-NIPP management agreement was dissolved shortly thereafter because the Committee had voted to not allow Hodgson to operate the Theater, and, on August 28th, ROT and NIPP entered into a management agreement for the Theater. Meanwhile, on August 18th, Hodgson submitted another PO to the Committee for its approval.

Hodgson thereafter requested that the Committee reconsider its August 4th decision to not allow him to operate the Theater. The Committee met the next day and made no decisions regarding Hodgson's newest PO or his request for reconsideration, but suggested that it address at its next meeting the issue of whether NIPP's liquor license should be transferred to ROT. On October 3rd, NIPP (which still owned the liquor license) and ROT jointly submitted a PO to the Committee, and ROT submitted another one on October 8th. The Committee approved the October 3rd PO at its October 14th meeting, but did not address the liquor license transfer. ROT thereafter submitted yet another PO, which the Committee approved on November 6th. At that time, it also voted to recommend to the City Commission that NIPP's liquor license not be renewed unless, before the license came up for renewal, NIPP installed a fire suppression system in the Theater. Moreover, the Committee voted to recommend that NIPP's Class C liquor license be transferred to ROT, but recommended that the dance permit accompanying the liquor license not be transferred. The City

5

Commission adopted these recommendations, but the MLCC, which has the final authority to grant or deny a liquor license transfer, never acted on these recommendations and has never transferred NIPP's liquor license to any entity.

Plaintiffs filed this action on July 21, 2004, alleging that the Defendants had violated their rights to due process and equal protection, retaliated against them for exercising their First Amendment rights, conspired to deprive them of their constitutional rights, and failed to prevent the violation of their constitutional rights, and that the Defendants are liable to them for damages under the RICO Act. The complaint also contains several state-law causes of action.

On September 14, 2004, the Defendants collectively filed a motion to dismiss for failure to state a claim upon which relief can be granted. The district court took the motion under advisement and, on January 6, 2005, entered an order converting it to a motion for summary judgment and directing the parties to present to the court any evidence and arguments that they wanted considered for purposes of the motion. Several months later, after hearing oral argument on the motion, the court granted summary judgment to the Defendants on all of the Plaintiffs' federal claims and declined to exercise jurisdiction over the remaining state-law claims.[2] Plaintiffs timely appealed.

## II. Standard of Review

Initially, Plaintiffs contend that the district court actually disposed of their federal claims on a Federal Rule of Civil Procedure 12(b)(6) motion, which would require us to treat all of their factual assertions as true, because Defendants had initially filed such a motion and the parties had engaged in very limited discovery. *See Westside Mothers v. Olszewski*, 454 F.3d 532, 537 (6th Cir. 2006)

---

[2]The district court actually "remanded" the state law claims even though the case was originally filed in federal court. This court will take the district court's remand as though it had declined supplemental jurisdiction and dismissed the state law claims for lack of subject matter jurisdiction.

(stating that this court reviews a district court's grant of a defendant's Rule 12(b)(6) motion de novo, but taking the facts in the light most favorable to the plaintiff and only affirming if the plaintiff could not bring forth any set of facts that would entitle him to relief); *TriHealth, Inc. v. Bd. of Comm'rs of Hamilton County, Ohio*, 430 F.3d 783, 789 (6th Cir. 2005) (explaining the difference between review under Rule 12(b)(6) and summary judgment). However, the district court explicitly gave all of the parties notice that it was considering the motion to be one for summary judgment and that it was cutting off discovery, and the record reflects that the Plaintiffs filed no motion requesting additional discovery or Rule 56(f) affidavit advising the court of the need for further discovery or the kind of evidence they would have been able to produce during discovery that would have created a genuine issue of material fact for trial. The district court clearly complied with the requirements of Rule 12(b) in treating the motion as one for summary judgment. We therefore will review for abuse of discretion the district court's decision to limit discovery. *See Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) ("The importance of complying with Rule 56(f) cannot be overemphasized. [I]f the appellant has not filed either a Rule 56(f) affidavit or a motion that gives the district court a chance to rule on the need for additional discovery, this court will not normally address whether there was adequate time for discovery." (internal quotation marks and citations omitted)).

We review de novo a district court's grant of summary judgment, using the same standard under Rule 56(c) used by the district court, *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc), and we consider the record as it stood before the district court at the time of its ruling. *Niecko v. Emro Mktg. Co.,* 973 F.2d 1296, 1303 (6th Cir. 1992). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

7

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To withstand summary judgment, the non-movant must present sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### III.  Due Process

**A.  Substantive Due Process**

We have generally defined the term "substantive due process" as "[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992) (internal citations omitted). And we have long defined a violation of substantive due process as an "egregious abuse of governmental power." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 442 F.3d 410, 432 (6th Cir. 2006) (citing *Vinson v. Campbell County Fiscal Court*, 820 F.2d 194, 201 (6th Cir.1987)). The Plaintiffs' first step in making out a substantive due process claim must be to show a protected property or liberty interest. *See Ferencz v. Hairston*, 119 F.3d 1244, 1247 (6th Cir. 1997).

8

The district court held that Plaintiffs lacked standing to sue on their substantive due process claims. Initially, it found that the law was clear that none of the Plaintiffs had a property interest arising out of the liquor license because they are not licensees, citing *Wojcik v. City of Romulus*, 257 F.3d 600, 609-10 (6th Cir. 2001); *Johnson v. Liquor Control Comm'n*, 254 N.W. 557, 559 (Mich. 1934). It also rejected the Plaintiffs' contention that they had a property interest in the approval of a PO based on either the city liquor control ordinance or the management agreements formed with NIPP. With regard to the Plaintiffs' claim of a property interest purportedly derived from the ordinance, the court found that under the plain language of the ordinance, parties that do not own a liquor license have no right to submit a PO unless that non-licensed party is applying for a new license or for the transfer into the city of a license issued elsewhere. And because a transfer of ownership of an existing license in the city is subject to the sole discretion of the Commission, the proposed transferee can have no property right in the license. Finally, the court found that Plaintiffs could not assert NIPP's rights because the circumstances did not fall within the exceptions to the general rule that one party may not represent the interests of another that has voluntarily chosen not to pursue its own claim.

There are both Article III and prudential limits on the ability of certain persons to bring suit to enforce rights. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 332 (6th Cir. 2002) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Under Article III, the plaintiff must show that he has suffered an invasion of a legally protected interest that is concrete, particularized, and actual or imminent; that there is a causal connection between the injury and the challenged conduct; and that a favorable decision by the court is likely to redress the plaintiff's injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Case law has also created three prudential requirements: that

9

the plaintiff assert his own interests and not the interests of others, that the claim be more than a general grievance, and, in cases where the plaintiff complains about a statute, that the claim fall within the "zone of interests" regulated by the statute. *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999).

Moreover, a party may assert the rights of others only in certain very limited situations: when the party asserting the right has a "close relationship" with the person possessing the right, when the party possessing the right is hindered in its ability to enforce that right, and when the party bringing suit has had an action taken against it that results in the violation of a third party's right. *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004).

Michigan case law is clear that a party who has never had an interest in a particular liquor license or entertainment permit has no property right in the transfer of that license or permit to him. *Wojcik*, 257 F.3d at 610; *Barr v. Pontiac City Comm'n*, 282 N.W.2d 348, 350 (Mich. App. 1979); *Wong v. City of Riverview*, 337 N.W.2d 589, 590 (Mich. App. 1983). Only the holder of such a license has a property interest in it. *Wojcik*, 257 F.3d at 609-10. It is clear that the Royal Oak Ordinance provides these Plaintiffs with no enforceable rights. Plaintiffs' evidence demonstrates that they had no property interest here: they did not have a liquor license or dance permit; they were not seeking to transfer an existing license into Royal Oak; and they were not applying for a new license. Plaintiffs therefore were not within the limited classes of applicants who were entitled to submit a plan of operation and to be heard. The ordinance conferred no substantive rights on these Plaintiffs, and whether we hold, as the district court did, that they have therefore suffered no injury and do not have standing to bring a substantive due process claim with regard to the liquor license and the plan of operation for the Theater, or that they cannot state any claim for a substantive due

process violation because they have no property interest in the license or its transfer or a plan of operation for the Theater, the result is the same.

Plaintiffs do not fare any better by arguing that they are simply seeking to vindicate NIPP's rights because NIPP is not at all hindered in bringing the suit or in its ability to submit a PO to the City, and Plaintiffs do not assert how the actions taken against them have affected NIPP's right to operate an establishment in the Theater or the right to serve alcohol there. The district court was clearly correct in holding that the Plaintiffs lacked standing to bring any claim on behalf of NIPP.

## B. Procedural Due Process

Due process requires that before an individual is finally deprived of his property, he be provided notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Plaintiffs have asserted that they were denied due process when the Defendants deprived them of the right to speak before the Committee adopted the two resolutions that – according to Plaintiffs – prevented Hodgson from ever operating the Theater, and when the Committee granted the request for a transfer of the liquor license to ROT but then revoked the license without notice.

### 1. August 4th Resolutions

Plaintiffs complain that at the September 11, 2003, meeting Committee members conspired to alter the minutes of the August 4, 2003, meeting with regard to resolutions passed at that meeting. Making sense of this claim from Plaintiffs' brief has been no mean feat, but we are satisfied that the Plaintiffs have provided no evidence to support it. The district court held, and we agree, that Plaintiffs' argument that these resolutions prevented Hodgson from ever operating the Theater is not tenable. The record does not support the claim that the Defendants altered the August 4th

11

resolutions. Furthermore, ROT eventually received permission to operate the Theater under some of the POs that it submitted for approval.

Finally, Plaintiffs cannot prevail on their procedural due process claim because they were entitled to no process whatsoever. As we have explained with regard to Plaintiffs' substantive due process claim, under the ordinance they did not fit within any of the categories of applicants who were entitled to submit a plan of operation and to be heard, and they therefore had no right to be heard and no legal interests to protect.

### 2. Revocation of Liquor License

If the Defendants had revoked Plaintiffs' lawfully transferred liquor license with no hearing whatsoever, Plaintiffs would certainly have a colorable procedural due process claim. However, the Defendants did not revoke any such license. The Committee voted to recommend that NIPP's liquor license be transferred to ROT, and the City Commission agreed, but the MLCC never actually transferred the license. The MLCC is in fact the only body that has the power to effectuate a transfer; its failure to act on the recommendation of the Committee and City Commission was not the equivalent of a revocation of the license, and, in any event, was not attributable to the Defendants. None of the Plaintiffs ever had a liquor license that could be revoked.

### IV. First Amendment

Plaintiffs also argue that the Defendants retaliated against them for exercising their right to speak and petition the government under the First Amendment. A First Amendment retaliation claim requires evidence that: (1) the plaintiff engaged conduct protected by the First Amendment; (2) the government actor took an adverse action against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least

12

in part by the fact that the plaintiff engaged in the protected conduct. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

We will assume for purposes of argument only that Plaintiffs have shown that they were engaged in protected conduct because they were speaking before the Committee in an attempt to have their various POs approved (although, as we have explained, under the ordinance, the Plaintiffs had no right to submit their POs and the ordinance imposed no obligation on the Committee to listen), and that they suffered an adverse action because the Committee denied their requests and arguably disseminated false information regarding incidents occurring during Hodgson's tenure as owner of "Space." But the record is devoid of evidence showing a causal connection between the protected activity and the adverse action, nor have the Plaintiffs provided any indication what evidence in this regard they could have produced had further discovery been permitted. *See Sierra Club v. Slater*, 120 F.3d 623, 638 (6th Cir. 1997) ("[A] a plaintiff complaining that a district court granted summary judgment without allowing adequate discovery must, at a minimum, be able to show that he could obtain information through discovery that would disclose material facts[.]"). The district court properly granted summary judgment on this claim.

### V.  Equal Protection, §§ 1985 and 1986, and RICO Act

Plaintiffs also brought claims for violations of their equal protection rights under 42 U.S.C. § 1983, violations of 42 U.S.C. §§ 1985 and 1986, and for damages under the RICO Act. The district court did not address any of these claims, although it stated that it was granting "Defendants' motion for summary judgment on Plaintiffs' federal claims."

### A.  Equal Protection

Plaintiffs claim that the Defendants denied them equal protection of the laws by denying Hodgson the right to conduct any business at the Theater, and by voting to revoke Hendrickson's transferred liquor license (both reprises of earlier arguments), and by "taking other adverse actions against Plaintiffs . . . in a manner that treated Plaintiffs much more harshly than similarly [] situated businesses in Royal Oak." Plaintiffs characterize these as claims of selective enforcement, and, as we understand this argument, allege that the City treated them differently from other similarly situated persons because Plaintiffs exercised their First Amendment rights to petition the government and to criticize publicly the manner in which the Defendants handled matters involving the Plaintiffs.

Putting aside the fact that this appears to be no more than a recasting of the First Amendment retaliation claim addressed earlier, it is clear that Plaintiffs have wholly failed to set forth evidence of disparate treatment. "Selective enforcement claims are judged according to ordinary Equal Protection standards, which require a petitioner to show both a discriminatory purpose and a discriminatory effect." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). In this case, because Plaintiffs claim that they are "a class of one" for purposes of the equal protection analysis, *see Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), they must show that they have been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id*. Plaintiffs have wholly failed in this regard. Although Plaintiffs have alleged that others similarly situated to them were treated differently, the record contains no evidence to support that allegation, nor have Plaintiffs provided any indication how they would be able to support it if further discovery were conducted. The equal protection claim is wholly unsupported by evidence in the record and the Defendants are entitled to summary judgment on that claim.

**B. Sections 1985 and 1986**

Plaintiffs also brought claims alleging violations of 42 U.S.C. §§ 1985 and 1986, arguing – as we understand this claim – that the Defendants conspired to change the minutes of a prior Committee meeting to reflect that the two resolutions denying Hodgson's PO were passed on a day when they were in fact not addressed.

Section 1986 liability is derivative of § 1985 liability. *Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc.*, 32 F.3d 989, 994 (6th Cir. 1994). A § 1985(3) cause of action for conspiracy requires that the plaintiff prove four elements: (1) the existence of a conspiracy; (2) the purpose of the conspiracy was to deprive any person or class of persons the equal protection or equal privileges and immunities of the law; (3) an act in furtherance of the conspiracy; and (4) injury or deprivation of a federally protected right. *Id*. at 993. We have held that § 1985(3) applies only where the discrimination was based on race or membership in another class comprising "discrete and insular minorities that receive special protection under the Equal Protection Clause because of inherent personal characteristics." *Volunteer Med. Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 224 (6th Cir. 1991) (internal quotation marks and citations omitted). Plaintiffs argue that just as they may comprise a "class of one" for purposes of their equal protection claim, they are a "class of one" for purposes of their § 1985(3) claim. Not surprisingly, Plaintiffs provide no authority whatsoever for this claim, and we reject it. It is clear that even if these Plaintiffs can claim to be a "class of one," their membership in that class is "not entitled to the kind of special protection which would make § 1985(3) applicable to Plaintiff[s'] claim." *McGee v. Schoolcraft Cmty. Coll.*, No. 04-1924, 167 Fed. Appx 429, 436 (6th Cir. January 18, 2006) ("The group of individuals seeking a degree as a certified occupational therapy assistant may be a relatively discrete minority, but certainly it is

neither based on inherent personal characteristics nor traditionally the subject of special protection under the Equal Protection Clause."). Nothing in the Supreme Court's opinion in *Village of Willowbrook* provides any support for arguing to the contrary. The Defendants are entitled to summary judgment on these claims as well.

## C. RICO

Finally, Plaintiffs assert that Defendants are liable to them for damages arising out of the Defendants' alleged racketeering activity. 18 U.S.C. §§ 1961 and 1962 provide a cause of action for civil damages arising out of racketeering activity, provided the plaintiff can show (1) two or more predicate offenses; (2) the existence of an "enterprise"; (3) a nexus between the pattern of racketeering activity and the enterprise; and (4) an injury to the plaintiff's business or property. *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir. 2000); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Plaintiffs have wholly failed to plead – let alone show evidence of – any predicate offenses committed by the Defendants, and the most generous reading of their complaint and the evidence in the record comes up short with regard to the existence of an enterprise. Defendants are entitled to summary judgment on this claim.

## VI. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

16